William R. **MASON**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 21818.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 8, 1969.

Decided June 30, 1969.

Mr. Milton A. Kallis, Washington, D. C. (appointed by this court), for appellant.

Mr. Roger E. Zuckerman, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty. at the time the brief was filed, Frank Q. Nebeker, Asst. U. S. Atty., at the time the brief was filed, and Thomas Lumbard, Asst. U. S. Atty., were on the brief, for appellee.

Before BAZELON, Chief Judge, BURGER [*] and ROBINSON, Circuit Judges.

BAZELON, Chief Judge:

This appeal presents several questions concerning the admissibility of identification evidence under United States v. Wade [1] and Stovall v. Denno.[2]

Appellant was convicted of forgery and uttering. The evidence showed that on the morning of June 22, 1967, a man and a woman withdrew $1300 from the

---

[*] Burger, Circuit Judge, did not participate in the decision.

[1.] 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

[2.] 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

savings account of one Mrs. Sudie Mokrane, using the latter's savings account passbook and a forged withdrawal slip. Shortly thereafter Mrs. Mokrane discovered the apparent theft of the passbook and some cash from her apartment. She then told the police that she suspected appellant, who had seen where she kept her money during a visit two nights before and who had been in the neighborhood at about the time when the theft apparently occurred.[3]

Miss Linda Schulz, the bank teller who handled the withdrawal transaction, identified appellant as the male member of the withdrawal team.[4] In addition, she described an identification she made of appellant in the Court of General Sessions when he appeared, along with a number of other criminal defendants, for his preliminary hearing. In a *Wade-Stovall* hearing out of the jury's presence, she said she had also identified a single photograph of appellant shown to her by the police on the afternoon of the withdrawal. However, while admitting her other identifications, the trial court excluded evidence of this photographic identification.

Appellant contends that none of Miss Schulz's three identifications were properly admissible against him. Unimpressed, the Government maintains that even the photographic identification

should have been received. We agree with appellant.

## I

At the Court of General Sessions some two weeks after the offense, Miss Schulz was told to sit among the spectators and watch the area where defendants awaiting hearings are seated, to see if she recnized anyone. She knew that the arrested suspect would appear in court, and she apparently also knew that he was the man whose photograph she had previously identified.[5] She spotted appellant among a group of perhaps a dozen defendants seated in two rows, at a distance from her of some 30 feet. She said she saw him two or three minutes after she arrived. Police Detective Rogers said the identification occurred a half-hour after her arrival. Rogers was uncertain whether appellant was in the first group of defendants to appear, but thought there might have been one or two groups before his.[6] Miss Schulz testified that she sat by herself and that, a few minutes after she saw appellant, Rogers walked up to her and asked if she had recognized anyone. Rogers testified that he sat together with the witness throughout and asked her nothing. It appears that of 38 persons who had hearings in General Sessions that morning, 30 were Negro and 5 were white; the color of the other three is unknown.[7] Rogers was unable to say whether appellant was the only white man in his group, but he believed not. The question presented is whether *Wade* entitles a defendant to the assistance of counsel at

---

3. Appellant was also charged wth housebreaking and petty larceny in connection with this apparent theft, but the jury acquitted him on these counts.

4. The forged signature on the withdrawal slip was evidently that of the unidentified woman. Appellant was convicted on evidence tending to show aiding and abetting the forgery and utterance.

5. Before the General Sessions viewing, Miss Schulz was taken to a "small cubicle," where Detective Rogers and a United States Attorney discussed appellant's case. Rogers gave the prosecutor the picture he had shown Miss Schulz on the afternoon of the offense and told him

that she had identified appellant from the photograph. Miss Schulz was not then shown the picture, but she saw Rogers hand it over and testified that she heard "the discussion" in the cubicle.

6. The defendants filed in through a door from the cellblock in groups and then sat in the courtroom to await their turn.

7. The prosecutor so informed the court immediately prior to closing arguments to the jury.

identification confrontations such as this.[8]

■ As we noted in Russell v. United States,[9] *Wade* speaks in broad and sweeping terms. While directly concerned only with a post-indictment line-up, it asserts that

> the confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial.[10]

These dangers, it was held, make a post-indictment line-up a "critical stage" of the criminal process at which the presence of counsel is accordingly required. The Court suggested no reason why other identification confrontations should be any less "critical." Indeed, the only argument against a counsel requirement recognized by the *Wade* court is that it might forestall prompt identifications—a danger not relevant to post-indictment line-ups; and the Court suggested only that "substitute counsel" might be a permissible means of avoiding this danger.[11]

In *Russell,* we held that in spite of its comprehensive language *Wade* did not apply to on-the-scene identifications occurring moments after an offense. We reached this conclusion only because we found compelling countervailing policy considerations militating against delaying identification confrontations in those circumstances.[12] Where time is not a factor, however, we were mindful of the Court's expressed inability to find any "substantial countervailing policy considerations * * * against the requirement of the presence of counsel." [13]

Assuming that irreparable prejudice may result from unsupervised preliminary hearing confrontations—an assumption apparently compelled by *Wade* —we can think of no sound reason why counsel should *not* be present at any such viewing. If legal assistance for indigent defendants is available anywhere, surely

---

8. We have held that preliminary hearing confrontations of this kind which occurred prior to the Supreme Court's *Wade* decision may in some circumstances pass the *Stovall* due process test. Dade v. United States, 132 U.S.App.D.C. 229, 407 F.2d 692 (decided December 24, 1968); Clemons v. United States, 133 U.S.App. D.C. 27, 408 F.2d 1230 (decided December 6, 1968) (en banc). In view of our holding that counsel was required at the General Sessions confrontation in the instant case, we need not decide whether there are stricter requirements for identification procedures in confrontations arranged after *Wade.*

9. 133 U.S.App.D.C. 77, 408 F.2d 1280 (January 24, 1969).

10. United States v. Wade, *supra* note 1, at 228, 87 S.Ct. 1926, 18 L.Ed.2d 1149.

11. *Id.* at 237 and n. 27, 87 S.Ct. 1926.

12. Russell v. United States, *supra* note 9, p. 1282. Delay to obtain counsel for a line-up involving a suspect found near the scene of the crime and moments afterwards might detract from the reliability of a very fresh identification and might also result in unnecessary detention of an innocent suspect. We were reluctant to conclude that the Supreme Court had considered and rejected these countervailing considerations. *Id.,* p. 7.

13. United States v. Wade, *supra* note 1, at 237, 87 S.Ct. at 939; Russell v. United States, *supra,* note 9, p. 6. *See, also,* Rivers v. United States, 400 F.2d 935, 939 (5 Cir. 1968), where the Fifth Circuit Court of Appeals observed that in view of the Supreme Court's "critical stage" analysis,

> With *Miranda* on the books, it is indisputable that most, perhaps all confrontations occurring after arrest will fall within the rules announced in *Wade* and *Gilbert.* We recognize the risk of ever letting a dissenter speak momentarily for the Court as to what it has really held, but Mr. Justice White, dissenting in *Wade* said "the rule applies to any lineup, to any other techniques employed to produce an identification and a fortiori to a face-to-face encounter between the witness and the suspect alone, regardless of when the identification occurs, in time or place, and whether before or after indictment."

it may be obtained in the Court of General Sessions.

The Government says somewhat obscurely that a counsel requirement would complicate the already chaotic preliminary hearing process and more specifically that it would hinder efficient scheduling of such hearings.[14] But it has long been established that defendants are entitled to the assistance of counsel at preliminary hearings upon request, irrespective of any identifications which might occur.[15] If a defendant requests appointed counsel at his initial presentment before a magistrate,[16] it is common practice to postpone his preliminary hearing [17] in spite of the kind of scheduling difficulties the Government foresees.[18] Application of the *Wade* rule to preliminary hearings would do no more than extend similar protections to defendants who do not request counsel in situations where the police intend covertly to obtain identification evidence at the time of the hearing. The practical impact of such an extension would be principally to require exclusion of identification witnesses from the courtroom until counsel has been appointed.[19] If this limited consequence is really as pro-

14. Appellee's argument in full is as follows:

Appellant would now have this Court render wholesale exclusion of witnesses from courtrooms where they await preliminary hearings unless appointed counsel were scrutinizing the courtroom scene with wary eye. Whatever protections this might afford * * * it would work a far greater intrusion into the preliminary hearing process, complicating presentation of witnesses by the Government and defense, making far more difficult the manner by which those proceedings are in cases as that below continued until a date convenient to all, overburdening an already underderstaffed defense bar, and making far more chaotic what is an already hectic process in the Court of General Sessions. We cannot imagine that the Supreme Court in *Wade* contemplated such a result.

15. *E. g.*, Dancy v. United States, 124 U.S. App.D.C. 58, 361 F.2d 75 (1965); United States v. Killough, 114 U.S.App. D.C. 305, 315 F.2d 241 (1962) (*en banc*); Wood v. United States, 75 U.S.App.D.C. 274, 128 F.2d 265, 141 A.L.R. 1318 (1942). Under the Criminal Justice Act of 1964, the court or magistrate is to appoint counsel for an indigent defendant who appears without counsel unless he affirmatively waives this right. 18 U.S.C. § 3006A(b) (1964).

16. *See* F.R.Crim.P. 5(a) (b).

17. Under F.R.Crim.P. 5(c).

18. Indeed, this practice was followed in the instant case when appellant, upon presentment after Miss Schulz's identification, decided to retain his own counsel.

F.R.Crim.P. 5(c) provides that if the defendant does not waive preliminary examination at the time of his presentment, then the commissioner shall hear the evidence "within a reasonable time."

19. It is possible that in some cases this will curtail the practice of making the parade of defendants at a preliminary hearing session do double duty as a lineup. By the time counsel has been appointed, the defendant may have been singled out in such a way as to prevent a witness then admitted to the courtroom from viewing him as an undifferentiated member of a group. In such a case, the committing magistrate may order the defendant to appear for a lineup at some later time instead. *See* Adams v. United States, 130 U.S.App.D.C. 203, 399 F.2d 574, 578–579 (1968). *See also* United States v. Allen, 133 U.S.App.D.C. 84, 408 F. 2d 1287 (order entered January 30, 1969).

There may be an occasional case in which the Government expects an identification witness, who has not yet made a line-up identification, to testify at the preliminary hearing of a defendant for whom counsel is not appointed prior to the hearing. In such cases, since a pre-hearing courtroom identification cannot be made, the result may be that the witness must make his identification in the relatively more prejudicial circumstances of a single-suspect confrontation. To avoid this anomalous result, efforts should be made to obtain counsel for defendants prior to the hearing. That failing, the prosecutor should explain his dilemma to the magistrate, who may see fit to arrange in impromptu lineup under his own supervision or to take other remedial measures.

cedurally burdensome as the Government suggests, a simple (and in most cases eminently desirable) solution is to hold a formal line-up in the presence of counsel or, if necessary, "substitute counsel" arranged for by police or prosecutor, either before or after the hearing.

Thus, if we are to adhere to the view of *Wade* we took in *Russell,* we must conclude that it applies to preliminary hearing confrontations.

The Government earnestly contends, however, that upon examination the rationale of *Wade* does not extend to such open-court viewings. It says that they entail no serious potential for improper influence and that in any event counsel could do little to alleviate such suggestivity as may inhere. Accordingly, it concludes that the General Sessions confrontation in the instant case was not a "critical stage" of appellant's prosecution.

The assertion that prejudicial influences are unlikely to be present rests primarily on the fact that the police presumably cannot "rig" the "line-up" parade out of the cellblock and into the courtroom. But while it pointed with alarm to recorded instances of unfairly contrived line-ups, the *Wade* Court was expressly concerned with unintentional as well as deliberate unfairness. "We do not assume," it said,

> that these risks are the result of police procedures intentionally designed to prejudice an accused. Rather we assume they derive from the dangers inherent in eyewitness identification and the suggestibility inherent in the context of the pretrial identification.[20]

These dangers may result from such diverse influences as the witness's desire to cooperate with the police, from his knowledge that he is expected to identify *some one* he sees (or indeed, as in the instant case, that he has already identified some one he will see), from uncertain recollections of a stranger's face distorted by a mental focus on particular features, from a generalized feeling of anger or vengeance, from suggestions subtly planted by the conduct or demeanor of a nearby policeman or other witness, from a calling of the defendant's name or an overheard description of his offense, and of course from a fortuitous line-up grouping which makes the defendant conspicuous or unique. A preliminary hearing viewing in open court reduces some of these inherent hazards, but it hardly eliminates them. In fact, the lack of police control over the makeup of a courtroom line-up is a double-edged sword: it precludes conscious alleviation, as well as deliberate exaggeration, of unfairly suggestive elements.[21]

Nor do we think it manifest that counsel is not needed to detect and counteract those suggestive influences which remain. The Government relies on the fact that preliminary hearing viewings are matters of public record, lacking in secrecy and capable of reconstruction at trial by enterprising defense counsel. An absence of secrecy, however, is at best a modest benefit if no one is watching. So long as only the policeman and the witness know that an identification confrontation is in progress, the defendant will be hard put to discover the myriad subtle suggestions which may have passed from policeman to witness. Nor is ther any likelihood that the many actors on the General Sessions stage, each absorbed in his own business, will recall the details of the parade of defendants which happened to serve as a line-up. It is not enough to say that appel-

---

20. United States v. Wade, *supra* note 1, 388 U.S. at 235, 87 S.Ct. at 1936.

21. In Clemons v. United States, *supra* note 8, we cautioned with specific reference to preliminary hearing viewings that

> It must be evident * * * that the conditions of such a confrontation are much harder to control than those of a formal lineup, and that it is also much more difficult to establish by clear and undisputed testimony exactly what those conditions were. It is, at the least, a practice fraught with perils to a degree suggesting its sparing use as the part of prudence.

*See also* Dade v. United States, *supra* note 8 (opinion of Chief Judge Bazelon).

lant's defense counsel might, with world and time enough, have tracked down the 38 participants in the General Sessions parade and thus determined for himself whether any of them resembles his client. Even could he realistically be expected to do this, there is no assurance that he could accurately reconstruct before a jury the particular grouping in which his client appeared. A public record of 38 names is not the equivalent of the "legislative or other regulations * * * which eliminate the risks of abuse and unintentional suggestion at line-up proceedings and the impediments to meaningful confrontation at trial"—which the *Wade* Court said may "remove the basis for regarding the [identification] stage as 'critical.'" [22]

Apart from subtle suggestivity about which we can only speculate, the instant case raises the possibility of conspicuous unfairness which counsel would have been able to uncover, since it may be that appellant was the only white man in his "line-up." [23] In addition, the testimony indicates that Detective Rogers either sat with Miss Schulz while she watched for appellant or else approached her for a progress report shortly after appellant appeared. Neither of these alternatives necessarily reveals bad faith on the part of the officer, but both are obviously

ripe with potential suggestion. [24] Besides equipping himself to explore these potential sources of misidentification before the jury, had counsel been present he could have substantially reduced them. As we recently observed, *Wade* envisions not only that counsel may detect unfairness, but also that he may actively participate in minimizing the risks of misidentification. [25]

■ We hold that there is no exception to the *Wade* rule for confrontations which occur at preliminary hearings. Accordingly, Miss Schulz's General Sessions identification was inadmissible; and since the error was plainly not harmless beyond a reasonable doubt, the conviction must be reversed. [26]

## II

In anticipation of a possible new trial, we must also determine the admissibility of the photographic and in-court identifications.

Miss Schulz learned that she had been deceived about two hours after the event. At that time, she recalled the couple who had made the unusually large cash withdrawal. She gave the police a reasonably complete description of appellant. A few hours later, Detective Rogers returned with a single photograph of appellant,

22. United States v. Wade, *supra* note 1, at 239, 87 S.Ct. at 1938.

23. *See* text, *supra* p. 1177. Of course, the applicability of *Wade* to a preliminary hearing confrontation does not depend on a showing of prejudice in the particular case, but the instant particular case demonstrates the kind of potential prejudice which makes counsel necessary at such confrontations.

24. The *Wade* Court observed:
Williams and Hammelmann, in one of the most comprehensive studies of [eyewitness] * * * identification, said, "[T]he fact that the police themselves have, in a given case, little or no doubt that the man put up for identification has committed the offense, and that their chief pre-occupation is with the problem of getting sufficient proof, because he has not 'come clean,' involves

a danger that this persuasion may communicate itself even in a doubtful case to the witness in some way * * *." Identification Parades, Part I, [1963] Crim.L.Rev. 479, 483.

388 U.S. at 235, 87 S.Ct. at 1936.

25. United States v. Allen, *supra* note 19. Our subsequent denial of a motion in the nature of mandamus to require such participation by counsel, Reese v. United States (D.C.Cir. No. 22,748, order entered February 13, 1969) (unreported), in no way undercuts our observations in *Allen* on this question. *Allen* held specifically that questions concerning the conduct of lineups are "beyond the scope of mandamus." *Id.*, 408 F.2d 1287.

26. Gilbert v. California, 388 U.S. 263, 272–274, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

who he told her was a suspect. Miss Schulz said appellant was indeed the culprit. At trial, she was able to recall the circumstances of the illicit withdrawal transaction in some detail. She confessed that it was "hard to separate the images" of the man at her window, the photograph, the General Sessions viewing, and the defendant at trial; and she did not "know exactly if what I feel today is the result of seeing him again"; but she said that "as far as the recognition goes, I remember what he looked like when he came up to my window." She appeared to be a competent and composed witness, and she had no doubt that appellant was the man.

■■■ Photographic identifications must be excluded if they result from a viewing "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." [27] The showing of a single photograph is, like all identification procedures involving a single suspect, highly suggestive. In the instant case, it was also completely unnecessary. No urgent need for immediate action prevented Detective Rogers from taking the small trouble to bring several similar photos with him. The record does provide grounds for an argument that Miss Schulz observed appellant with some care and might have had an independent basis, unaffected by the suggestivity of the single mug shot, for her identification. [28] On the other hand, as defense counsel pointed out at trial, she may well have been under strong psychological pressure to make an identification. She had permitted the loss of $1300. She was a young and inexperienced teller who had been on the job a little more than three months. Though she conceded that the cash withdrawal was unusually large, she had neither compared the signature on the withdrawal slip with Mrs. Mokrane's signature card nor requested any identification from appellant or his companion. Thus, her prompt identification of the culprit leading to his apprehension could have promised to get her out of some very hot water. Without questioning her sincerity or intelligence, we cannot ignore the fact thaat such circumstances maximize the dangers inherent in single-suspect identifications. The trial court was strongly of the view that no reference to the photographic identification could be made before the jury. We cannot say that this determination was error.

Miss Schulz's in-court identification could be admitted only if the Government had established

> by clear and convincing evidence that [it was] * * * based upon observations of the suspect other than the [illegally obtained] * * * identifications.[29]

The presumption is that the in-court identification was the product of the prior photographic and General Sessions identifications. Since we cannot say that the photographic identification most probably rested on an independent basis, we can hardly find "clear and convincing evidence" of such an independent source for the subsequent in-court identification.

Reversed.

27. Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

28. Cf. Clemons v. United States, *supra* note 8.

29. United States v. Wade, *supra* note 1, at 240, 87 S.Ct. at 1939.