**UNITED STATES of America**
v.
**James E. YORK.**
**Crim. No. 319-68.**

United States District Court,
District of Columbia.
Jan. 27, 1970.

**540**

Stanley Dietz and William M. Barnard, Washington, D. C., for defendant.

Asst. U. S. Atty. Robert S. Bennett, for the Government.

## MEMORANDUM OPINION

CORCORAN, District Judge.

The defendant, James York, was indicted in eleven counts for robbery and assault with a dangerous weapon[1] in connection with the holdup of a Hahn's Shoe Store on December 30, 1967. A jury found him guilty on all counts on August 22, 1968, and the Court sentenced him to three to ten years on each count, sentences to run concurrently.

The in-court identification of the defendant by Loren J. Seifert, the principal witness for the Government, was challenged on appeal as being tainted by the pretrial identification procedures followed by the police.

The Court of Appeals (Judge Robb dissenting) remanded this case for further proceedings in the District Court to determine if there was an independent source for Seifert's in-court identification. (United States v. York, 138 U.S. App.D.C. 197, 426 F.2d 1191 (1969).

Briefly and chronologically, Seifert first identified the defendant from photographs supplied to him by the police the afternoon of the robbery and again three weeks later. He then picked the defendant out of a large group sitting in a General Sessions courtroom without prompting but, however, at a time when the defendant was not accompanied by counsel. At the preliminary hearing he made an in-court identification and underwent extensive cross-examination. Finally he made an in-court identification at the trial.

At the trial no reference was made to the General Sessions identification. However, while the appeal was pending, Mason v. United States, 134 U.S.App.D. C. 280, 414 F.2d 1176 (1969) was decided which made inadmissible General Sessions identifications when defendant's counsel is not present.

This decision led the Court of Appeals in *York* to comment:

"Early in the trial, the Court ruled that the Government might properly ask Seifert to identify appellant from the witness stand. But it is clear to us, as the Government now concedes, that the viewing in the Court of General Sessions infringed appellant's right to counsel as defined in our recent *Mason* opinion. So, with Seifert's in-trial identification thus jeopardized, we need not, even if we could, inquire whether that identification was further embarrassed by any im-

1. 22 D.C.Code §§ 2901, 502.

propriety accompanying the photographic displays to which Seifert was exposed.

\* \* \* \* \* \*

"The record before us is deficient at too many points to enable us to proceed with confidence toward a decision as to whether there was an independent source that would vindicate the identification Seifert made at the trial." United States v. York, *supra*, at 1192–1193.

The remand hearing was held December 5, 1969. The Government produced Seifert as a witness. It also produced Officer Raymond E. Denz, Special Operations Division of the Metropolitan Police Department. Denz was the officer who displayed to Seifert the photographs from which the final identification just prior to the issuance of the arrest warrant was made. Defense counsel proffered no testimony but did cross-examine the Government witnesses.

Making necessary allowance for fading memories as to detail (the remand hearing was more than two years after the incident in question), the evidence adduced through the witnesses corresponded in substance to that previously produced. The totality of that evidence is substantially as follows:

The incident in question occurred at approximately 8:00 a. m. December 30, 1967. The lighting conditions were good —it was "daylight" and the store's interior lighting was turned on. (Remand Tr. 6).

Mr. Seifert testified that he first saw the man, whom he later identified as York, as that man who was coming down the stairs holding a shopping bag. Another man holding a shotgun was behind the defendant. Mr. Seifert said he was only a few feet from York, face to face with him, for a few seconds. (Remand Tr. 6–7). He said York was not wearing a "facial covering" and he could not remember if he had a mustache. (Remand Tr. 7, 16).

On cross-examination he testified that he "had a clear view of the front gentleman with the shopping bag." (Remand Tr. 19). He said what stood out in his mind was seeing him face to face and his size. (Remand Tr. 12–13). He also testified on cross that they grabbed each other and "sort of bounced" across the floor (Remand Tr. 14) and while moving across the floor he remained in a face to face position.

He testified that he remembered describing the defendant to police as a man of "football player" size and that he gave a "guess of height and weight and color." (Remand Tr. 16). Due to the lapse of two years his memory on the details of his description was hazy.

At the preliminary hearing, when Mr. Seifert's memory was fresh, he testified he described York as wearing a hat, tan corduroy pants and a light colored wind breaker or car coat made of raincoat material. He said he was roughly 6 feet 2 inches, about 230–240 pounds, Negro, and quite husky. He remembered especially the way his cheeks were shaped. He was not wearing sun glasses when Mr Seifert saw him. (Prelim. Tr. 18–19).

At trial he repeated his weight and height description of a football player size man with a tan jacket and tan slacks. (Trial Tr. 35, 110, 115). He testified he was nose to nose with York as they "bounced across the store." (Trial Tr. 35–36, 110). While they were checking his clothes, the big man was facing him. (Trial Tr. 119). He could not remember if he had a mustache but he did know that "his face was rough \* \* \* not real smooth." (Trial Tr. 116–117). He said he would remember him because "we made contact and also because of his size." (Trial Tr. 37).

Giving leave for the haziness of memory after a two-year period, which Mr. Seifert honestly admits, his testimony is now substantially as it was at the time of the robbery investigation and trial.

It is the Court's conclusion that Mr. Seifert had ample opportunity under

good lighting conditions in a face to face encounter to view the defendant.

In its opinion the Court of Appeals directed the trial court to bring out the procedures and circumstances surrounding the photographic identification so as to determine whether the police used any impropriety in displaying the photographs. If the procedures used did infringe the defendant York's rights, then it had to be determined if this tainted identification "embarrassed" Seifert's in-trial identification.[2]

■■■ The rule in regard to photographic identification was laid out in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) and further explained in United States v. Hamilton, 137 U.S.App.D.C. 89, 420 F.2d 1292 (1969). In *Simmons* the Court said the "totality of the surrounding circumstances" must be looked at, and the identification would be set aside only if it "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, *supra*, 390 U.S. at 384, 88 S.Ct. at 971. The Court pointed out that some of the circumstances to consider included the opportunity to observe the defendant at the crime and the lapse of time between the crime and the photographic identification.

The Court of Appeals in *Hamilton* discussed *Simmons* and said in effect that the defendant's photograph cannot be highlighted or its selection prompted in any way. Other important circumstances include the "number and types of photographs used, the physical characteristics of the individuals depicted, and the recurrence of the same photographed subject." United States v. Hamilton, *supra*, at 1295.

At the remand hearing Seifert testified that the morning of the robbery he was shown "book on top of book" of photographs but did not pick out the defendant. The afternoon of the same day he returned to Police Headquarters, was shown 15–20 pictures and identified York as the man carrying the shopping bag. (Remand Tr. 12). He was shown a color slide of the defendant and testified that there might have been some question as to pigmentation but he could not remember what. (Remand Tr. 18). But he thought the "identification was sufficient to lead to the arrest." (Remand Tr. 19).

Again allowing for the haziness of memory, there is no conflict between this and his earlier testimony at the trial. Then he testified that the morning of the robbery he looked through a lot of books of photographs but did not pick out anyone, that in the afternoon he looked at 15 to 20 pictures and identified the defendant York. (Trial Tr. 13). He was positive at that time that it was a picture of one of the robbers. He then said the police showed him a color slide of the suspect and he again was "positive" of it. (Trial Tr. 13). "At that particular time that afternoon, I thought I positively picked somebody out." (Trial Tr. 41). Later, he testified, "I assumed that the answer I gave them [the police] at that particular time, that it was sufficient for them" (Trial Tr. 123) and he told the police that this was the man.

He testified that the evening of the robbery the police returned to the store with photographs and slides and that he again identified the picture of the defendant out of a group of pictures. (Trial Tr. 43). Later in January he said that Officer Denz came into the store with a book of pictures and asked him to look through it, and he again identified the defendant York. In fact he said he did not know if the photographs were the same each time, but he did know that the person he identified was the same person. (Trial Tr. 23).

---

2. "In conducting this inquiry, the court will, of course, consider evidence pertaining to photographic identification attempts to the extent relevant to the question of independent source." United States v. York, *supra*, at 1193.

He testified that none of the pictures was emphasized when shown to him; no picture had more than one face in it; no information concerning the individual in the picture was given to him before he looked at the pictures. (Trial Tr. 15–16, 45–46).

Officer Denz of Special Operations Division also testified at the remand in regard to the photographic identification. He compiled the package of 23 photographs shown to Mr. Seifert later in January. He said he had only a small group of photographs to work from— "maybe 30"—and picked out the ones "best suited for him to make an identification without prejudice." (Remand Tr. 24). He was unsure as to how long it was after the robbery that he showed the pictures to Seifert. The pictures were in a 5 by 10 folder with four pictures on a page. He did not open the book for him but just gave it to him. (Remand Tr. 27). He testified that Mr. Seifert looked through the complete book and then went back and picked out York's picture as well as two others whom he had also said were in the store at the time of the robbery. He said he did not in any way suggest which men to pick out. (Remand Tr. 22–23).

After detailed study the Court feels that the complete record (Trial and Remand) reflects that the following sequence occurred in regard to the photographic identification.

Mr. Seifert did not identify the defendant when he looked through the books of pictures the morning of the robbery. When he returned in the afternoon he looked at 20–25 pictures and identified York. He also identified him when he saw a color slide. That evening he again looked at pictures and again identified him. Three weeks later on January 20 he again picked York's picture out of a group of pictures compiled by Officer Denz.

There is no evidence of suggestiveness on the part of the police. Mr. Seifert made three separate identifications of a photograph of defendant York from a group of photographs. Two of the identifications were made the day of the crime.

On the basis of this record so made [3] the Court finds:

■ (1) That the General Sessions identification cannot be said to have tainted the later in-court identification by Seifert. It must be kept in mind that the General Sessions identification *followed* three photographic identifications, which in turn were based upon a face to face encounter in a well lit area. That encounter took place only a few hours before the first photographic identification, when the mental impression of the witness was vivid, vivid enough indeed to have enabled the witness to give a description to the police as to the color, weight and height of his assailant and as to the clothing worn by him. Notwithstanding the Sixth Amendment defect in the General Sessions identification, it could hardly be argued an identification of the person, made spontaneously and without suggestion, taints a photographic identification previously made. To the contrary, it may well be argued that such an identification corroborates that the witness had a strong mental image of his assailant which enabled him to make identification readily and immediately upon confrontation. Nor does it follow under the circumstances of this case that a later in-court identification is tainted by the fact that counsel was not present in the General Sessions Court. The absence of counsel may preclude the use of that identification, but it certainly cannot negate the fact that the identification was spontaneously made and without suggestion.

■ (2) That there was no impropriety in the manner in which the photographic identification was made. Here the Court has in mind the fact that shortly after the robbery Seifert looked

3. As noted, the defense was unable or unwilling to proffer any additional witnesses, and so far as this Court is aware no other witnesses are available to expand, contradict or substantiate the record.

at "book on top of book" of mug shots without being able to point out a suspect. Surely this was an indication that no one was trying to direct his attention to a particular shot and a further indication of his innate honesty in being unwilling to make an identification as to which he was not morally certain. Subsequently, when he did make a photographic identification, he made it from a group of 20–25 photographs which were handed to him without comment or without suggestion as to any particular photograph in the group. He repeated the same identification under similar non-suggestive circumstances two more times. This can hardly be said to be "so impermissively suggestive as to give rise to a very substantial likelihood of irreparable misidentification" under *Simmons*.

(3) That on the basis of the foregoing there was an independent source—namely the eyeball confrontation at the place of the robbery—to "vindicate" Seifert's in-court identification.

■ In the course of the remand proceeding the defense counsel while contributing nothing additional to the record, apparently proceeded on the assumption that there was a presumption of invalidity in the photographic identification which had to be overcome by the Government. This Court can find nothing in the Court of Appeals opinion (nor in any other case) which would justify a presumption of invalidity. True, the Government's burden under *Wade* and its progeny is "to present clear and convincing evidence" that the in-court identification was based on other than illegally obtained identification[4] but that does not presume invalidity. And if one looks to the language of *Simmons* to the effect that photographic identification may be used "unless the circumstances are so impermissively suggestive as to preclude their use," the presumption, if any, would seem to be in favor of validity.

---

4. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).