**Lamar RUDD, Petitioner,**

**v.**

**STATE OF FLORIDA, Respondent.**

**No. 71–430–Civ–J.**

United States District Court, M. D. Florida, Jacksonville Division.

May 30, 1972.

214

Kathryn L. Powers, Jacksonville, Fla., for petitioner.

Wallace E. Allbritton, Asst. Atty. Gen., Tallahassee, Fla., for respondent.

## OPINION AND WRIT OF HABEAS CORPUS

CHARLES R. SCOTT, District Judge.

Petitioner, an inmate at the Belle Glade Correctional Institution, Belle Glade, Florida, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2241 et seq. Petitioner alleges that five in-court identifications admitted by the state trial court were violative of his rights as protected and guaranteed by the Sixth and Fourteenth Amendments to the Constitution. This Court agrees and hereinafter issues this writ of habeas corpus.

Lamar Rudd[1] initially filed his petition for relief in *pro se* form. Subsequent to the issuance of an order to show cause, the respondent filed a response. This Court then appointed Kathryn L. Powers, Esquire, of the Jacksonville Bar, to represent petitioner as court-appointed counsel and ordered an evidentiary hearing which was held before this Court on December 8, 1971. The Court heard testimony, entertained oral argument, perused the Court file and established a briefing schedule.

Petitioner alleged in his initial pleading that he had exhausted his state

1. Hereinafter sometimes "Rudd", sometimes "petitioner" and sometimes "defendant".

remedies, as required by 28 U.S.C. § 2254(b), by a direct appeal of his state court conviction to the District Court of Appeal of Florida, First District, by a motion for rehearing subsequent to that Court's affirmance of his conviction, and by a petition for writ of habeas corpus filed before the Supreme Court of Florida. Although the appeal to the First District Court of Appeal was affirmed by that Court in a *per curiam* opinion which discussed none of the issues raised, this Court notes that the appeal raised the issue of the admissibility of the in-court identifications. There has been no contention that the petitioner has failed to exhaust his state remedies, and this Court finds that petitioner herein has exhausted his state remedies. 28 U.S.C. § 2254; Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953); Wade v. Mayo, 334 U.S. 672, 68 S.Ct. 1270, 92 L.Ed. 1647 (1948); Thomas v. Decker, 434 F.2d 1033 (5th Cir. 1970); *cf.* Picard v. Connor, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (Dec. 20, 1971).

Petitioner pled not guilty in the Criminal Court of Record of Duval County, Florida, to an information which charged him with robbery. The case went to a jury which returned a verdict of guilty and the defendant was thereinafter sentenced to a term of 40 years. The information charged, and the conviction stemmed from, an alleged robbery of a "7–11 Store" on December 7, 1968. That date is important. Consequently, each of the five in-court identifications of the defendant, hereinafter discussed, which were preceded by an out-of-court line-up, photographic display or show-up occurred between December 7, 1968, and July 31, 1969.

## I. THE DEFECTIVE LINE-UPS

At the trial two witnesses were called by the State to identify Rudd as the person who had robbed each of them on separate occasions. These witnesses were called by the State in order to present evidence of a collateral offense and to show a general scheme, plan and design.[2]

Ernest Payne, a part-time employee and manager of the Jackson Minit Market, testified that the defendant Rudd was the person who robbed him on January 3, 1969.[3] The witness testified that he had observed the bandit for a minute or a minute and a half which was "[N]ot too long".[4] The State failed to present evidence to the trial court, out of the presence of the jury, that Payne had earlier attended a line-up where he identified the defendant Rudd.[5]

Payne was called by petitioner as a witness at the evidentiary hearing held before this Court. Payne testified that he attended a line-up between the time of the January 3, 1969, alleged crime and the trial [6] and that he could not remember that counsel representing Rudd was present at that line-up.[7] Payne testified that he had had an opportunity to observe the perpetrator of the alleged crime for only two or three minutes [8] and that, as to his recollection of the assailant's

---

2. Mrs. Susan H. Black, Assistant State Attorney, made these representations to the trial court. See the Trial Transcript (filed herein October 22, 1971) at pp. 59–60 and 66. (The Trial Transcript will hereinafter be identified as "TT at _____.")
 The United States Court of Appeals for the Fifth Circuit has recently held that the admission of evidence of other robberies allegedly committed by the defendant near the same date as that of alleged offense does not rise to constitutional proportions. Dinkins v. Wainwright, 451 F.2d 587 (5th Cir. 1971).

3. TT at 63.

4. TT at 63 and 64.

5. *See* TT at 58–64.

6. This testimony appears in the record of the evidentiary hearing held before this Court on December 8, 1971, and filed herein on December 17, 1971 at 87. (This record will hereinafter be identified as "R at _____.")

7. R at 88.

8. R at 89 and 92.

clothing, he could not remember definite things.[9]

James P. Loos, Jr., was also called as a witness by the State. He testified that on the evening of January 3, 1969, he was a customer at a Jackson Minit Market when its manager, Mr. Payne, was robbed. Loos did not, however, know that a robbery had occurred until Payne told him that "[T]hat man just robbed me".[10] Loos identified the defendant at trial as that man.[11] The State failed to present evidence to the trial court, out of the presence of the jury, that Loos had earlier attended a line-up at which he identified the defendant Rudd.[12] Counsel for the defendant was able to elicit testimony on cross-examination in the presence of the jury that Loos had identified Rudd at a pre-trial line-up.[13]

Loos was also called by petitioner at the evidentiary hearing held before this Court.[14] Loos testified that he attended a post-arrest pre-trial line-up at which he identified the defendant Rudd[15] and that to the best of his knowledge defendant Rudd's attorney was not present.[16] Loos was not able to see the bandit's face completely at the crime scene and only observed it in part for about two and a half minutes.[17] He never got ". . . a direct look in his face at all"[18] and could not give any detailed description to the police.[19]

Petitioner Rudd was called as a witness at the evidentiary hearing before this Court.[20] Rudd testified that, subsequent to his arrest but prior to his trial, he had been placed in a line-up at the Duval County Jail for witness identification.[21] Rudd testified that he had requested of police officials that his counsel be contacted and present at the line-up[22] but that, when the line-up occurred, neither his counsel nor an appointed attorney was present.[23] Rudd testified that his counsel at that time was R. Hudson Olliff of the Jacksonville Bar[24] and that he did not waive his right to have counsel present at the line-up.[25] Rudd, in describing the line-up, testified that the men placed in the line-up were not of similar appearance[26], that most were not of the same height[27], that they were considerably heavier in weight[28] and that only one other man was partially bald.[29] Because of the light which was shining in his face, Rudd was unable to see those persons in the room who were viewing the line-up.[30]

Judge R. Hudson Olliff[31] was also called by the petitioner at the evidentiary hearing held before this Court.[32] Judge Olliff represented Rudd[33] and never attended any line-up[34] or show-up[35] of his client. Judge Olliff had some recollection about a telephonic communication from the police about a line-up where-

9. R at 92.

10. R at 67.

11. R at 69.

12. TT at 66–69.

13. TT at 70.

14. R at 94–100.

15. R at 95.

16. R at 95–96.

17. R at 97–98.

18. R at 98.

19. R at 99.

20. R at 6–7 and 16–32.

21. R at 17 and 28.

22. R at 18–19.

23. R at 19.

24. *Ibid.*

25. *Ibid.*

26. R at 20.

27. R at 20–21.

28. R at 21.

29. R at 22.

30. R at 28 and 29.

31. *Judge Olliff was, at the time of his representation of the defendant Rudd, engaged in the private practice of law.*

32. R at 8–15.

33. R at 10.

34. *Ibid.*

35. R at 10–13.

upon he advised the police that he had a previous commitment and suggested that any line-up be postponed until he could be in attendance.[36]

On the basis of a careful and detailed study of the transcript of record of the proceedings in the trial court and, especially, on the basis of the live testimony taken at the hearing before this Court, the Court hereby makes and enters the following findings of fact with regard to the line-ups:

1. R. Hudson Olliff, Esquire, was at all pertinent times, and especially at the time of the line-ups, the attorney for Lamar Rudd.

2. R. Hudson Olliff, Esquire, never attended a line-up of Lamar Rudd during the period of his representation.

3. No attorney, retained or court-appointed, ever represented Lamar Rudd at a line-up between the time of arrest on January 6, 1969, and the time of trial on July 31, 1969.

4. Lamar Rudd was required to participate in one or more (perhaps simultaneous) line-ups during the aforementioned period.

5. Lamar Rudd requested counsel at such a line-up, but counsel was not provided.

6. Lamar Rudd did not waive his right to counsel at any line-up.

7. Ernest Payne attended a line-up during the aforementioned period at which he identified Lamar Rudd.

8. James P. Loos, Jr., attended a line-up during the aforementioned period at which he identified Lamar Rudd.

9. The trial court admitted the in-court identifications of both Payne and Loos without first determining whether such in-court identifications were tainted by the illegal line-ups.

It is well settled that the Sixth Amendment guarantee applies to "critical" stages of criminal proceedings and that a post-arrest line-up is such a critical stage. Consequently, a defendant and his counsel should be notified of a line-up; and, absent an intelligent waiver by the defendant, counsel's presence is a requisite to the conduct of a line-up. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). In the instant case, the conduct of the two line-ups was without the presence of counsel and, as such, constituted a denial of petitioner's rights as guaranteed and protected by the Sixth Amendment to the Constitution.[37]

However, in-court identifications of an accused subsequent to such a constitutionally defective line-up are not *per se* inadmissible, for the Supreme Court has held that such a *per se* rule would be unjustified. *Wade supra* at 240, 87 S.Ct. 1926. Once such a constitutionally defective line-up is established, as here, the burden is upon the State to show ". . . by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the line-up identification". *Ibid.* The *Wade* decision requires that courts apply the "Wong Sun" test which provides:

"Whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint".

Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (quoting Maguire, Evidence of Guilt 221 (1959)). This Court concludes that, on the basis of the trial transcript and, especially, on the basis of the live evidentiary hearing before this Court, the

---

36. R at 13.

37. All confrontations in this case—whether line-ups, photographic displays or show-ups—occurred after the alleged crime on December 7, 1968. Thus, United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) apply to the instant case. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

State has failed to meet its burden. Here there is a case of primary illegality and primary taint; this Court cannot say in good faith that there was a "sufficiently distinguishable" basis for the in-court identifications. In this regard the Court has given consideration not only to the dry words appearing in the transcripts but especially to the demeanor of the witnesses as viewed by the Court.

■■ Without regard to the above consideration, this Court concludes that the trial court committed constitutional error when it admitted the in-court identifications without first determining that they were not tainted by the illegal line-up but were of independent origin. Gilbert v. California, 388 U.S. 263, 272, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). The *Gilbert* rule requires a two step procedure: First, the trial court must take evidence and apply the "Wong Sun" test out of the presence of the jury in order to determine whether there is a "sufficiently distinguishable" basis or independent origin for the in-court identification; second, if so, then the trial court may admit such evidence to the jury.[38]

This Court cannot express a belief that such errors were harmless, for it cannot be said that the errors were harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Lucas v. Texas, 451 F.2d 390 (5th Cir. 1971). Consequently, this Court hereinafter grants and issues this writ of habeas corpus with regard to these line-up issues alone.

## II. THE PHOTOGRAPHIC DISPLAYS

Mr. Teddy C. Tilson, Jr., was the manager, cashier and operator of the 7–11 Store which was robbed on December 7, 1968. Tilson was called at the trial as a witness [39] and made an in-court identification of petitioner as the perpetrator of the crime.[40] Tilson testified that he had viewed the bandit for "two, three minutes at the most. . . . Not long, just a glance. . . ." [41] He could not recall any distinguishing marks on the bandit's head [42] but he did recall the bandit's cowboy-type straw hat which the bandit had pulled down pretty close over his head and face.[43]

Tilson was also called at the evidentiary hearing held before this Court.[44] He there verified that he had viewed the bandit for only two or three minutes [45], that the cowboy hat was pulled down "right on his eyes" [46] and that he had been unable after the robbery to give the police any positive description of the bandit's eye coloration, shape of nose, color of hair, shape of face, or whether the bandit in fact had any hair.[47]

At the trial Tilson testified that subsequent to the robbery, two police officers (perhaps detectives) came out to his home with four or five photographs and asked Tilson to "pick him out".[48] At the evidentiary hearing Tilson testi-

---

38. Petitioner might also have raised the *per se* exclusionary rule set out in Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). That rule provides that evidence of an illegal lineup itself is *per se* inadmissible at the trial and that the State is not entitled to show that it had an independent source. *Gilbert supra* at 272–273, 87 S.Ct. 1951. In the instant case the State did not, on direct examination, elicit testimony regarding the line-ups themselves. On cross-examination of Mr. Loos, defense counsel brought out the fact that Loos had attended a line-up. This Court views that testimony as an " . . . intentional relinquishment or abandonment of a known right or privilege". Johnson v.

Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

39. *See* TT at 9–23.

40. TT at 18.

41. TT at 17.

42. TT at 21.

43. TT at 17 and 22.

44. R at 33–58.

45. R at 42.

46. *Ibid.*

47. R at 43–44.

48. TT at 19.

fied that he was initially unable to identify Rudd but that he did manage to pick out two photographs. At that point Tilson was unsure of which photograph resembled the bandit.[49] The police officials then turned the pictures over, blocked off the top portion of the head, and manipulated the picture so that the photograph would resemble the bandit who had worn a cowboy hat which had covered the entire top of the head down to the eyes.[50] Only then did Tilson identify one of the photographs.

Jerry Dale Ison was called at the trial by the State [51] and made an in-court identification of the defendant Rudd as the man he saw leaving the 7–11 Store immediately after the robbery.[52] Ison saw the bandit at the door of the 7–11 when the bandit "passed by" him [53], and he was only able to see that portion of the bandit's face "[F]rom about the top of his nose down".[54] Sometime in January while Ison was at the home of a friend, two police officers brought over five or six photographs for possible identification.[55] Miss Elizabeth Sweat was also present for that identification. Ison picked up several of the photographs and, when he had one in his hand, he and Miss Sweat identified that photograph as a picture of the bandit.[56]

Miss Elizabeth Lloyd Sweat was also called at the trial as a witness for the State.[57] Miss Sweat testified at the trial that she had passed the bandit as she was entering the store but that she did not know he had robbed the store until the manager told her that he had just been robbed.[58] Miss Sweat made an in-court identification of the defendant Rudd as the person she had seen when she entered the 7–11 Store on the night

of the robbery.[59] Except for a day old beard, she had noticed no distinguishing characteristics of the bandit.[60]

Miss Sweat also testified at the evidentiary hearing held before this Court.[61] At the crime scene she had only observed the bandit "for a few seconds".[62] Miss Sweat testified that about a week after the robbery she and Ison simultaneously identified one photograph from a group of four or five in the presence of two police officers.[63] They both identified the photograph "about the same time".[64]

On the basis of the trial transcript and, especially, on the basis of the live evidentiary hearing held before this Court, the following further findings of fact are hereby entered:

10. When the police officials came to Tilson's home with several photographs they suggested and told Tilson to "pick . . . out" the bandit.

11. After Tilson was finally able to choose two photographs, the police officials suggestively manipulated the pictures so that Tilson selected a photograph which he identified as that of the bandit.

12. When the police officials met with Ison and Sweat and presented several photographs for possible identification, both witnesses were allowed to be in the room at the same time looking at the same picture or pictures.

13. Both Ison and Sweat made simultaneous and mutually reinforcing identifications of one photograph which they identified as that of the bandit.

With regard to photographic displays, the rule is that each case must be decided on its own facts and that a con-

49. R at 38.
50. *Ibid.*
51. TT at 33–40.
52. TT at 34.
53. TT at 36.
54. TT at 37.
55. TT at 35–36.
56. TT at 36.
57. TT at 23–33.
58. TT at 26.
59. TT at 27.
60. TT at 31.
61. R at 59–77.
62. R at 66.
63. R at 64–65.
64. R at 65.

viction based on eyewitness identification at trial subsequent to a pretrial photographic display will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L. Ed.2d 1247 (1968); United States v. Elliott, 437 F.2d 1253 (5th Cir. 1971); United States v. Sutherland, 428 F.2d 1152 (5th Cir. 1970); cf. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) (totality of the circumstances). This rule has been considered to provide for a two-part test:

> [F]irst, the photographic display itself must be impermissibly suggestive. Second, it must give rise to a very substantial likelihood of irreparable misidentification.

United States v. Ervin, 436 F.2d 1331, 1333 (5th Cir. 1971).

 In the instant case, the identification procedure utilized with regard to Tilson was clearly impermissibly suggestive in that, by accenting the feature of the hat which was prominent in Tilson's recollection of the bandit, the police suggestively managed to transfer the recollection from the hat to the person in the photograph. "The fault common to all these practices is that the police single out one person and influence the witness by directing attention to some element known to be connected with the crime. . . ." Crume v. Beto, 383 F.2d 36, 39 (5th Cir. 1967). Thus, the suggestive defect was in the manner of presentation. United States v. Sutherland, 428 F.2d 1152, 1155 (5th Cir. 1970).

 An identification procedure by two or more witnesses in the presence of each other is "fraught with dangers of suggestion". United States v. Wade, 388 U.S. 218, 234, 87 S.Ct. 1926, 18 L.Ed. 2d 1149 (1967); see also Gilbert v. California, 388 U.S. 263 at 269–270, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). In the instant case, the police officials improperly allowed Ison and Miss Sweat simultaneously to view and identify the photographs. In so doing neither witness had an opportunity to evaluate independently the identification material which he or she was examining. Therefore, any identification by one could not otherwise but color the judgment of the other. Thus, this Court holds that any simultaneous identification of a suspect by two or more witnesses in the presence of each other is so impermissibly suggestive as to amount to a denial of due process, and any subsequent in-court identifications must be subjected to a per se exclusionary rule. Cf. United States v. Ballard, 423 F.2d 127 (5th Cir. 1970); Pearson v. United States, 389 F. 2d 684 (5th Cir. 1968).[65]

 In determining whether the picture spread in a particular case is impermissibly suggestive, the trial court should follow a two step procedure: First, the court should be afforded an opportunity out of the presence of the jury to determine if the photographic identification was impermissibly suggestive, either in the photographs used or the manner or number of times they are displayed; second, if so, then the trial court should determine if the impermissibly suggestive picture spread gives rise to a likelihood of irreparable misidentification. United States v. Sutherland, 428 F.2d 1152, 1155 (5th Cir. 1970). In the instant case the trial court failed to apply these standards and, therefore, error was committed.

This Court cannot declare a belief that the constitutional errors committed in this case are harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705

---

65. Petitioner has rightly failed to argue that a photographic display is a "critical stage" at which he is entitled to Sixth Amendment rights, for in the Fifth Circuit it is the rule that the right to counsel does not extend to such a confrontation. United States v. Ballard, 423 F.2d 127 (5th Cir. 1970); contra, e. g., United States v. Zeiler, 427 F.2d 1305 (3d Cir. 1970).

(1967). Consequently, this Court hereinafter grants and issues this writ of habeas corpus upon an independent consideration of the photographic display issues alone.

## III. THE PREJUDICIAL SHOW-UPS

Lamar Rudd never knew, prior to trial, that he had been in a show-up, *i. e.*, that he had been presented by the police unbeknownst to him to witnesses who later identified him at trial.[66]

Mr. Tilson testified on direct examination for the State at trial that, subsequent to the "photographic identification", he had identified the defendant Rudd at the "District Attorney's" office.[67] It was developed at the evidentiary hearing held before this Court that Tilson came to the state attorney's office pursuant to a request from that office.[68] Tilson testified that, when he saw Rudd, the defendant was not alone and was seated in a small office.[69] Tilson then identified Rudd as the man who had committed the robbery.[70] Tilson did not understand why "all the witnesses" had been called to come to the state attorney's office.[71]

Miss Sweat also testified on direct examination for the State at trial that, subsequent to a request by the state attorney's office, and following the "photographic identification", she attended a show-up [72] at which she identified the defendant Rudd. She testified that Tilson also attended this show-up.[73]

At the evidentiary hearing held before this Court, Miss Sweat testified that she was asked to come to the state attorney's office during January for a show-up [74] " . . . to make sure as to his identity".[75] Miss Sweat testified that Tilson was present [76], that the defendant

Rudd was seated in an office and that she understood that the only other man in the room was a policeman.[77]

On the basis of the trial transcript and, especially, on the basis of the live testimony taken at the evidentiary hearing before this Court, the following further findings of fact are hereby entered:

14. In January, 1969, the state attorney's office contacted Teddy C. Tilson, Jr., to come to that office.

15. Tilson attended a January, 1969, show-up confrontation with Elizabeth Sweat at which he viewed and identified the defendant Rudd.

16. At the show-up confrontation the defendant Rudd was viewed in a small office where he was seated with a police officer.

17. In January, 1969, the state attorney's office contacted Miss Elizabeth Sweat to come to that office in order to identify the defendant Rudd.

18. Miss Sweat attended that show-up confrontation with Tilson.

19. At the show-up confrontation, Miss Sweat viewed the defendant Rudd who was seated in a small office with a person who Miss Sweat believed to be a police officer.

20. Miss Sweat there identified the defendant Rudd.

21. The witnesses Tilson and Miss Sweat were asked to participate at that show-up by the state attorney's office for the purpose of identifying the defendant Rudd.[78]

22. Lamar Rudd did not know a show-up confrontation was in progress at the time of its occurrence.

66. R at 23.

67. TT at 19.

68. R at 34, 57 and 58.

69. R at 34 and 53.

70. R at 36.

71. R at 58.

72. TT at 27.

73. TT at 28 and 31.

74. R at 63.

75. R at 61.

76. R at 63.

77. R at 61–62.

78. *Compare* United States v. Seader, 440 F. 2d 488 (5th Cir. 1971).

23. Rudd's attorney, R. Hudson Olliff, Esquire, was not notified of and did not attend any show-up confrontation of his client.[79]

It appears clear that

> [W]hatever may be said of lineups, showing a suspect singly to a victim is pregnant with prejudice. The message is clear: the police suspect *this* man. That carries a powerfully suggestive thought.

Biggers v. Tennessee, 390 U.S. 404, 407, 88 S.Ct. 979, 981, 19 L.Ed.2d 1267 (1968) (Douglas, J., dissenting) (the judgment below was affirmed by an equally divided Court). Because of the inherently suggestive nature of a one-on-one confrontation, a single suspect presentation is disfavored. Absent compelling circumstances, it would appear to be a denial of due process when a single suspect is presented to a witness. *Cf.* Crume v. Beto, 383 F.2d 36 (5th Cir. 1967).[80] The common fault with all such confrontations is the singling out process by the police which is *ipso facto* highly suggestive.

In the instant case the two witnesses were called to the state attorney's office for the purpose of identifying the defendant Rudd. This situation posed the implicit but obvious question: Isn't this the man? Since there was only a police officer with the defendant Rudd when he was viewed, there was no opportunity for the witnesses to consider any other persons.

■ Additionally troublesome in this case is the question: Why did the State utilize such a procedure if these witnesses had previously picked out the defendant at a photographic display? The logical inference is either that the picture previously selected was not that of the defendant Rudd or that the police authority was not certain whether the witnesses had positively and firmly identi- fied the defendant. Finally, an aura of taint is cast upon the whole situation; for, as the defendant Rudd was unaware of what was happening outside the door at the time of the confrontation, who can say what suggestive thoughts may have been transmitted to the witnesses as they each viewed the defendant. When only the police and witness know a confrontation is in progress, the defendant is hard put to discover any "myriad subtle suggestions". Mason v. United States, 134 U.S.App.D.C. 280, 414 F.2d 1176, 1180 (1969). This is especially true where there is a simultaneous show-up for two or more witnesses. *Cf.* Pearson v. United States, 389 F.2d 684 (5th Cir. 1968). The police officials here attempted to circumvent the need for a formal line-up, and

> [W]here police custody is involved, the need for a formal line-up may not be circumvented by keeping the arrestee away from the station house while contriving confrontations of a more informal nature.

United States v. Venere, 416 F.2d 144, 148 (5th Cir. 1969). Consequently, considering the totality of the circumstances, this Court concludes that the petitioner herein was denied due process of law in the conduct of the confrontation. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

■ Finally, this Court notes that evidence of the suspect confrontation was admitted at trial on direct examination by the State. Since the defendant was not warned of his right to counsel and since he did not intelligently waive such right, evidence of the identification should not have been admitted. Rivers v. United States, 400 F.2d 935 (5th Cir. 1968).

As to these constitutional errors, this Court cannot declare a belief that they were harmless beyond a reasonable doubt.

79. *See* Part I *supra.*

80. In the instant case there is no evidence of such compelling circumstances as the possibility of a sole witness dying (*see* Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) and Crume v. Beto, 383 F.2d 36 (5th Cir. 1967)) or of a *res gestae* situation (*see* Russell v. United States, 133 U.S.App. D.C. 77, 408 F.2d 1280 (1969)).

Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Consequently, on these show-up issues alone, this Court hereinafter grants and issues this writ of habeas corpus.

In issuing this writ, this Court in no way expresses any determination as to the guilt or innocence of the petitioner. The basic proposition for which this opinion stands is simply this: A defendant in a criminal prosecution is entitled to each and every of his constitutionally guaranteed and protected rights. *See* Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); Ex parte Royall, 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886). This petitioner did not receive such protection; he is entitled to a new trial.