**UNITED STATES of America ex rel. Mackey Raymond CHOICE, Appellant,**

v.

**Joseph BRIERLEY, Superintendent and District Attorney of Philadelphia.**

**Civ. A. No. 70–1607.**

United States District Court, E. D. Pennsylvania.

May 15, 1973.

Mackey Raymond Choice, in pro. per.; Francis S. Wright, Jr., Defenders Assn. of Philadelphia, Philadelphia, Pa., for plaintiff.

Judith Dean, Asst. Dist. Atty., Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

BRODERICK, District Judge.

Currently before the Court is Mackey Choice's petition for a writ of habeas corpus. On June 22, 1966, a jury in the Quarter Sessions Court of Philadelphia County found Mackey Choice guilty of burglary, conspiracy and aggravated robbery, and he is presently serving a sentence of 10 to 20 years in the State Correctional Institution at Graterford, Pennsylvania. Choice applied to this District Court for a writ of habeas corpus, and the district court judge denied him a 28 U.S.C. § 2254 evidentiary hearing and dismissed the petition. Choice appealed, and the Court remanded the case for an evidentiary hearing based on Mackey Choice's contention that the circumstances surrounding his station house identification were so unnecessarily suggestive and conducive to irrepar-

able mistaken identification that the subsequent in-court identification by those present at the station house denied him due process of law. *United States of America, ex rel. Mackey Raymond Choice v. Brierley,* 460 F.2d 68 (3rd Cir. 1972).

On October 30, 1972, pursuant to the mandate of the Court of Appeals, this Court held an evidentiary hearing. Based on a review by this Court of the State court record, the notes of testimony taken at the hearing before this Court, and the briefs and arguments of counsel, the Court issues this Memorandum and Order granting relator's petition for a writ of habeas corpus.

The background of this case is as follows:

On October 4, 1965, petitioner Mackey Choice was arrested by the police of the City of Philadelphia and charged with burglary, conspiracy and aggravated robbery. He was subsequently indicted on these charges, as set forth in Bill of Indictment Nos. 979–81 of October Sessions 1965 of the Quarter Sessions Court of Philadelphia County. Choice's first trial, held on December 13–15, 1965, ended when the jury could not agree on a verdict. On June 22, 1966, at a second trial before the Honorable James T. McDermott, the jury returned a verdict of guilty on all counts of the indictment. Post-trial motions were argued and denied, and on May 26, 1967, Mackey Choice was sentenced to a term of ten to twenty years on the aggravated robbery count. This sentence is to be followed by twenty years' probation on the burglary count. Sentence was suspended on the conspiracy count.

Mackey Choice appealed the judgment of sentence to the Superior Court of Pennsylvania, alleging *inter alia* that pre-trial identification procedures used by the police were so impermissibly suggestive as to deny him due process of law.[1] On November 21, 1967, the conviction was affirmed in a per curiam order, Judges Hoffman and Spaulding filing dissenting opinions. *Commonwealth v. Choice,* 235 A.2d 173, 211 Pa.Super, 176. On April 30, 1968, the Supreme Court of Pennsylvania denied Choice's request for allowance of appeal per curiam.

On May 16, 1968, a Post Conviction Hearing Act petition was filed in the Quarter Sessions Court of Philadelphia County, setting forth numerous grounds for relief, including the *Stovall* claim originally raised in the appeal before the Superior Court. A hearing on the petition was held before Judge McDermott on September 30, 1968.

On October 30, 1968, Mackey Choice filed his first petition for a writ of habeas corpus in this Court. On December 12, 1968, one of the learned judges of this Court dismissed the petition without prejudice on the ground that a Post Conviction Hearing Act proceeding was still pending in the Quarter Sessions Court of Philadelphia County.

On May 21, 1969, Judge McDermott filed an opinion dismissing Choice's Post Conviction Hearing Act petition, noting that the *Stovall* issue previously raised on direct appeal to the Superior Court was "admittedly mooted" by the decision of the Superior Court.

On June 17, 1970, Mackey Choice filed his second petition for a writ of habeas corpus in this Court. As in his first petition, he again raised the *Stovall* claim originally asserted on direct appeal to the Superior Court. This time, the same learned judge of this Court in an Opinion filed on September 9, 1970 denied Choice's Petition for Writ of Habeas Corpus without a hearing and concluded that there was no probable cause for appeal.

1. Between the time of petitioner's second trial and his direct appeal to the Superior Court, the United States Supreme Court in *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), held that the use of any identification testimony resulting from a pre-trial procedure so "unnecessarily suggestive and conducive to irreparable mistaken identification as to [violate] due process of law" was reversible error.

On October 1, 1970, a motion for certificate of probable cause was filed with our United States Court of Appeals. On April 15, 1971, the motion was granted. In an opinion filed on May 19, 1972, the Court of Appeals remanded the case to this Court for an evidentiary hearing based on Mackey Choice's contention that the circumstances surrounding his station house identification were so unnecessarily suggestive and conducive to irreparable mistaken identification that the subsequent in-court identification by those present at the station house denied him due process of law. United States ex rel. Choice v. Brierley, 460 F.2d 68 (3rd Cir. 1972). In its opinion, the Court of Appeals discussed the identification issue as follows:

Choice was tried in 1966, a year prior to the decision in *Stovall*. His conviction was based on the in-court identification by Alexander Johnson, the head bank teller and Lorraine Custis, another teller. Both were eye witnesses to the robbery. Each had been shown an array of photographs on the day of the robbery and prior to Choice's arrest. In addition, the two tellers had simultaneously participated in a show-up held a "few weeks" after the hold-up.

At trial the appellant tried to challenge the credibility of the eye witnesses by making reference to their prior identifications. He did not attack the admissibility of in-court identification, because at that time the prevailing rule was that "the manner of an extra judicial identification affects only the weight, not the admissibility of identification testimony at trial." Simmons v. United States, 390 U.S. 377 at p. 382, 88 S.Ct. 967 at p. 970, 19 L.Ed.2d 1247 (1968). The appellant, therefore, had no hearing at which he could challenge the admissibility of the in-court identification and it was left to the jury to pass on the credibility of the witnesses.

The practice of leaving the reliability and credibility of identification evidence to the jury was repudiated by *Stovall*. Under the mandate of *Stovall*, a judge is required to make his own inquiry into the manner of the out-of-court identification. The test is whether the in-court identification the government seeks to introduce is based on the witness' recollection of the crime or whether it is the product of suggestion instilled during the course of the pretrial investigation. Only if his evaluation of the testimony convinces him that the out-of-court identification by a witness was not "so unnecessarily suggestive and conducive to irreparable mistaken identification" that it denied the defendant due process, can he permit subsequent in-court identification by that witness to reach the jury. Choice is entitled to the protection of *Stovall*. United States ex rel. Trignani v. Russell, 405 F.2d 1119 (3d Cir. 1968).

*Stovall* calls for a consideration of the out-of-court identification in terms of the "totality of the circumstances surrounding it." The factors which the district court must consider in applying the *Stovall* standard coincide with those applicable to a *Wade* or *Simmons* situation: (1) the manner in which the pretrial identification was conducted; (2) the witness' prior opportunity to observe the alleged criminal act; (3) the existence of any discrepancies between the defendant's actual description and any description given by the witness before the photographic identification; (4) any previous identification by the witness of some other person; (5) any previous identification of the defendant himself; (6) failure to identify the defendant on a prior occasion; and (7) the lapse of time between the alleged act and the out-of-court identification. See United States v. Zeiler, 447 F.2d 993, 995 (3d Cir. 1971), United States v. Higgins, 458 F.2d 461 (3d Cir. filed March 28, 1972).

Townsend v. Sain, 372 U.S. 293, 312, 83 S.Ct. 745, 757, 9 L.Ed.2d 770

(1963) held that "[w]here the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court." Since, as our examination of the record discloses, (1) the facts crucial to appellant's *Stovall* claim are in dispute and (2) the appellant did not receive a "full and fair" hearing in the state court, there should be an evidentiary hearing in the district court.

United States ex rel. Choice v. Brierley, *supra*, pp. 72–73.

Pursuant to the mandate of the Court of Appeals, this Court held an evidentiary hearing on October 30, 1972 for the purpose of determining whether the facts surrounding the out-of-court identification of Mackey Choice were so unnecessarily suggestive and conducive to irreparable mistaken identification that subsequent in-court identification by the same witnesses denied Mackey Choice due process of law.

On September 22, 1965, at approximately 9:15 A.M., two men entered the Citizens and Southern Bank located at 19th Street and South Street in Philadelphia and robbed it of approximately $38,000. There were four tellers in the bank at the time, but two of them were unable to identify Mackey Choice. While one of the robbers held a shotgun on the three women tellers, the other robber took the fourth teller, Alexander Johnson, into the bank's vault and ordered him to fill up a bag with money. June Cutler, one of the tellers who could not identify Mackey Choice, testified that the other robber had a shotgun and "gave us orders to stay right where we were and to look straight at him" (N.T. Second Trial 112–13). June Cutler testified that she did just that and was, therefore, unable to observe the robber who entered the vault with Alexander Johnson (N.T. Second Trial 113, 116). Lorraine Custis, another teller, was also confronted by the unknown robber with the shotgun, but at the trial identified

Mackey Choice as the robber who went into the vault. She testified that she had her head down counting travelers checks when she "saw a shadow go past" (N.T. Second Trial 50). Assuming it was a customer on his way to speak with Alexander Johnson at the rear of the bank, she did not look up (N.T. Second Trial 51). Suddenly she heard someone say "this is a stickup. Don't anyone move", and looking up she saw a man whom she identified as Mackey Choice vaulting over a gate or railing six or seven feet away (N.T. Second Trial 51–52). Lorraine Custis testified that she got a profile view only of the man, who "didn't take very long to go over the gate" (N.T. First Trial 95), "about three seconds or so" (N.T. Second Trial 78). While in the vault with Alexander Johnson, only the robber's back was visible to Lorraine Custis (N.T. Habeas Corpus 97). When he came out, she saw him "just like a shadow" because the man with the shotgun ordered her to keep looking straight ahead (N.T. Second Trial 79). Finally, she saw the front of his face "very quick" (N.T. Second Trial 56–57; N.T. First Trial 97). He then walked out of the bank, while his companion with the shotgun kept everyone covered (N.T. Second Trial 57). According to Lorraine Custis, the man she identified as Mackey Choice was wearing a hat and a jacket (N.T. First Trial 94), but she couldn't see "too well as far as color"; "it appeared to be a sort of khaki material" (N.T. First Trial 94). She could only see the side of his hair (N.T. First Trial 116), and at the preliminary hearing conceded that she couldn't describe his hair at all (N.T. Preliminary Hearing 10/12/65, p. 19). She heard him make the one statement: "This is a stickup; don't anyone move" (N.T. Second Trial 62–63). Even this, she admitted, was not said "directly" to her (N.T. First Trial 99).

Lorraine Custis' observations of the man she identified as Mackey Choice were, at best, fleeting glimpses of a

swiftly moving individual made under the barrel of a shotgun while ordered to look straight ahead.[2]

Alexander Johnson, the teller who went into the vault with the robber, identified Mackey Choice at the trial. Alexander Johnson testified that he was talking with another teller when he heard a voice say "just stay where you are" (N.T. Habeas Corpus 54). Looking up, he saw a man jumping over the gate in the rear of the bank (N.T. First Trial 15, 38–39), a gate he variously described as four or five feet (N.T. First Trial 15) and eight or ten feet (N.T. Habeas Corpus 58) away. As the man vaulted over the gate, he was facing Alexander Johnson, who testified that he had a half or three quarters of a minute to observe his face (N.T. Habeas Corpus 75). The man then came within two feet of Alexander Johnson and ordered him to open the vault (N.T. Second Trial 10–11). As they walked to the vault, they were "kind of side by side" (N.T. Habeas Corpus 56) while at the vault Alexander Johnson was told to "go in first" (N.T. Second Trial 11). In the vault, it took Alexander Johnson a minute or a minute and a half to fill a bag provided him by the robber (N.T. Second Trial 12). During this time he only saw the robber's face for "a few seconds" (N.T. Habeas Corpus 75–76). When the bag was filled, Alexander Johnson was ordered to stay in the vault while the robber left (N.T. Second Trial 13). As the robber walked away, his back was to Alexander Johnson, who never saw his face again (N.T. Habeas Corpus 77). Alexander Johnson's opportunity to observe the man he identified as Mackey Choice was apparently limited to little more than a minute: the thirty or forty seconds when the robber was jumping over a gate four to five or eight to ten feet away, the brief face to face encounter when he was ordered into the vault, and the "few seconds" when they faced each other in the vault.

At noon about two hours and 45 minutes after the robbery, Policemen Charles Canty, Eugene Wright and William Braxton—all of the Special Investigation Squad—arrived at the bank with some ten or twelve pictures for the tellers to look at (N.T. Habeas Corpus 8, 27–28). William Braxton testified at the hearing before this Court and stated that he was present at the time Mackey Choice's photograph was selected from the batch by Alexander Johnson and Lorraine Custis.

[BY MR. BRAXTON]: At that time, and they had gone through all the pictures that I had and gone through the pictures that Canty had, and they had chose—picked out Choice's picture, at which time they looked at the picture among themselves and they kept it in their hands for quite a little while looking at the picture, and they said positive that this is the man, this man is the man.

But they said could we see this man? (N.T. Habeas Corpus 10).

\*　　\*　　\*　　\*　　\*　　\*

Q. But when they came to Officer Canty's group they found the picture?

A. That's right.

Q. At least one?

A. That's right.

Q. And they gathered around and they said this is the one?

A. That's right.

Q. That means they looked through the pictures together?

A. That's right.

(N.T. Habeas Corpus 24).

---

2. Significantly, the two tellers working next to Lorraine Custis, both of whom were also threatened by the man with the shotgun, could not identify Mackey Choice at either of his trials. June Cutler did not see the man in the vault at all (N.T. Second Trial 113, 116), while Mrs. Russell (the fourth teller) said that she mostly observed the man [man with the shotgun], but [as to Mackey Choice] she was not able to say that it was not him, she was not able to say that it was him (N.T. Second Trial 110).

Q. . . . they did at least look at the pictures together?

A. They looked at the pictures and they picked the picture.

Q. Do you remember who spoke first?

A. I think it was Mrs. Custis.

Q. Mrs. Custis said that may be the man or that is the man?

A. Yes.

Q. And then Mr. Johnson—

A. And then Mr. Johnson looked at the picture and they held the picture for quite some time and showed the picture to other employees of the bank.

Q. And finally decided that was the one?

A. They came to the conclusion that this was the picture.

(N.T. Habeas Corpus 25).

There was considerable testimony at trial, and Alexander Johnson himself admitted at the hearing before this Court, that he picked out other pictures that day in addition to that of Mackey Choice. The testimony of Officer Braxton was uncontradicted at the hearing before this Court that the police permitted the tellers to view the photographs simultaneously. At the trial Officer Canty, since deceased, testified on direct examination that the tellers viewed the photos separately. According to Officer Braxton, considerable discussion preceded the identification of the photo of Mackey Choice as the robber who went into the vault. According to Officer Braxton, it was Lorraine Custis who first identified the photo of Mackey Choice. (N.T. Habeas Corpus 25).[3] The extent to which Lorraine Custis' identification led Alexander Johnson to identify the photo of Mackey Choice is a matter of conjecture.

Both Officer Braxton and Sergeant Wright testified at the hearing before this Court that Officer Canty had received a tip from an informer that there was going to be a bank robbery at some unspecified time, and that members of a certain gang might be involved (N.T. Habeas Corpus 19, 22–23, 29–30). When they went to the bank, Canty brought along with him a packet of pictures of alleged members of the gang, including one of Mackey Choice (N.T. Habeas Corpus 23, 30–31, 35–36, 39). Sergeant Wright testified that all members of the gang were black and all were within a five-year age span (N.T. Habeas Corpus 30). The pictures themselves were free from suggestive identifying marks and descriptive phrases such as indications of height, weight, etc.

Two weeks after the robbery, Mackey Choice was arrested and taken to police headquarters at 22nd and Hunting Park. Officer Joseph Caponi then went to the bank and returned with Alexander Johnson and Lorraine Custis (N.T. Habeas Corpus 48–49). He told them he "had someone I wanted them to look at," that he was going into another room and sit down with the individual, that when they entered he would order the man to turn around and face them and that they were not to make an identification until they all left the room again (N.T. Habeas Corpus 44, 49). Officer Caponi then entered the interrogation room and began questioning Mackey Choice. Shortly thereafter, both witnesses were brought in and allowed to overhear a portion of the interrogation (N.T. Second Trial 19, 59–60). Mackey Choice was then ordered to stand up and turn around, and both tellers were asked "Is this the man?" (N.T. Habeas Corpus 16) or "Is that the one?" (N.T. Second Trial 20). Lorraine Custis immediately identified petitioner on the basis of his physical appearance and movements as well as his voice (N.T. Habeas Corpus 43); Alexander Johnson apparently made his identification out in the hall (N.T. Second Trial 20). Once

3. After their joint identification, both tellers wanted "to see this man" (N.T. Habeas Corpus 10). Their purpose remains unclear, but one conclusion is that some doubt still persisted, especially in the mind of Teller Johnson.

again, a joint identification occurred, and once again Lorraine Custis led the way; Alexander Johnson was again in the position of merely agreeing with Lorraine Custis, who at the trial testified that her identification at the station house was based on "the picture I saw and . . . what I saw in the bank" (N.T. Second Trial 62). Officer Caponi testified that the reason there was no lineup was that he was under orders to conduct no lineups while certain litigation on the subject was pending (N.T. Habeas Corpus 50–51).

At the hearing before this Court, Alexander Johnson could recall describing for the police the robber's complexion, height and khaki jacket (N.T. Habeas Corpus 60). Just prior to the first trial, Alexander Johnson was interviewed by an investigator for the defense and provided the following description:

[BY MR. CHRISTINE]:

I asked him to describe the man, as he had seen him in the bank.

He told me that he was wearing a khaki jacket, that he had a hat. He didn't know whether it was brown or black or blue, but it was felt. He didn't know the band on the hat. His hair was black. He had pants and shirt. He didn't know what color they were.

I asked him if he had any special characteristics about his face, pimples, or large nose or big ears or mustache. There was nothing special about his face that he noticed. (N.T. First Trial 146).[4]

Alexander Johnson was the only teller with any real opportunity to meaningfully view the face of the man in the vault. Significantly, when he was shown pictures by the police after the robbery, it appears that Mackey Choice was not the only one he selected. According to Mr. Christine's unrebutted (see N.T. Second Trial 135–136) testimony at trial, Alexander Johnson freely admitted picking out not one but three pictures immediately after the robbery:

[BY MR. CHRISTINE]:

. . . He told me that right after the robbery he notified the police and that the police did come to the bank and that a detective showed him six or eight photographs, police photographs. Out of that six or eight he picked three that looked like the person that had been with him in the vault in the bank. (N.T. Second Trial 127).

And at the hearing before this Court, Alexander Johnson corroborated Mr. Christine's testimony as follows:

BY THE COURT:

A. And you admit now—and I am directing this question to you, Mr. Johnson—that you told Mr. Christine that?

A. Yes.

Q. Did you tell Mr. Christine the truth?

A. That I had picked out several photographs and said this, any of these could be the one?

Q. Yes.

A. Yes.

Q. That was the truth?

A. Yes. There was more than one photograph shown to me that resembled the man. (N.T. Habeas Corpus 90).[5]

---

4. By stipulation of counsel, it was agreed that if Mr. Christine were called to the stand during the hearing before this Court, he would have testified that he could remember nothing of his interview with Mr. Johnson seven years ago, but that the testimony he gave at the first and second trials was true and accurate (N.T. Habeas Corpus 105).

5. Mr. Johnson also testified at trial and before this Court that there was a second identification session, apparently held shortly after he failed to make a positive identification at the preliminary hearing (N.T. First Trial 40–44; N.T. Habeas Corpus 83–86). The record is obscure on this point, but apparently once again Mr. Johnson picked out several other pictures that could have been of the man with him in the vault. In any event, after the first photographic identification, the one-on-one confrontation and the preliminary hearing, by the time of this

At the preliminary hearing, both Alexander Johnson and Lorraine Custis repeatedly refused to positively identify Mackey Choice as the man who had taken Alexander Johnson into the vault. Although a concerted effort was made by both defense counsel and the prosecution to obtain more explicit testimony, both tellers persisted in saying that Mackey Choice merely "looked something like" or "resembled" the man in the vault (N.T. Preliminary Hearing 10/11/65, p. 2, 9–11, 13; N.T. Preliminary Hearing 10/12/65, p. 4, 6, 8–9, 14, 16, 20). At trial, however, both Alexander Johnson and Lorraine Custis identified Mackey Choice explaining that their failure to identify him at the preliminary hearing was based on fear (N.T. Second Trial 36–37, 68–69).

At the first trial, Alexander Johnson also explained his failure to previously identify Mackey Choice on the ground that he was afraid of Mackey Choice. He went on, however, to add another consideration:

Q. Why were you unwilling to say it was [petitioner]?

A. Well, I was afraid. I thought when the trial came up, I thought that once they got the right man, that there would be sufficient evidence that that was the man, without the identification just depending on me to say so. I was unwilling to say.

Q. Mr. Johnson, are you testifying today that the defendant was in the bank because you were told by someone that without your testimony there is no case against the defendant?

A. No, but at the other hearing—up to now, I haven't heard anything else presented. In other words, I thought

either he would make a mistake or he would admit it, or they would find both men, or something would come up that there wouldn't be any doubt. (N.T. First Trial 24–25).

Alexander Johnson went on to say that he had no doubt and was certain of his identification, but there is a hint in the above-quoted testimony that buried within the complexities of human motivation Alexander Johnson might have been experiencing more than a mere fear of Mackey Choice.[6]

The testimony of the witness Lorraine Custis at the hearing before this Court was not helpful in illuminating the issues involved here. She recalled almost nothing at all, and concluded by stating that she was now a woman of the "cloth" and had prayed to have worldly things removed from her mind. She testified that her prayers had been answered and as a result she is now unable to recall anything concerning the identification of Mackey Choice.

During Lorraine Custis' testimony at the preliminary hearing she repeatedly responded to questions with regard to identification by saying that Mackey Choice resembled the robber, but testified later that she was frightened at the preliminary hearing. At the first trial, Lorraine Custis stated that she must have been frightened to have testified at the preliminary hearing that one of the robbers was six foot eight. (See N.T. Preliminary Hearing October 12, 1965, 18; N.T. First Trial 117). At the close of the preliminary hearing, she stated:

The minute Mr. Johnson and I walked into the room . . . and Mr. Choice was sitting in the chair, the minute we walked in—

second showing Mr. Johnson apparently had decided that Mackey Choice's photograph was at least closest to that of the man in the vault. (N.T. First Trial 44).

6. Although technically not a "failure to identify" in the context used by the Court of Appeals, it should also be noted at this point that Mrs. Russell, who apparently managed the same fleeting glimpses as did Mrs. Custis,

was unable to say either that the man in the vault was petitioner, or that he was not (N.T. Second Trial 110). See United States v. Zeiler, (2nd case), *supra*, where the fact that all witnesses identified the defendant was held to be a relevant and significant factor in assuring that the in-court identifications were untainted by an impermissible pre-trial photographic identification.

THE COURT: You didn't know who he was at the time, did you?

A. No. From the side view, from what I saw at the bank, from him sitting there in the chair, and the build and everything, it just, you know how something registers upstairs (indicating head).

(N.T. Preliminary Hearing October 12, 1965, 36).

At the first trial she testified that she changed her testimony because she had to live with herself and her previous failure to identify Mackey Choice at the preliminary hearing bothered her, and she stated that Mackey Choice was definitely one of the two robbers because "I know." (N.T. First Trial 111). She said that even at the magistrate's hearing she had recognized Mackey Choice as one of the robbers (N.T. First Trial 112). She stated:

You want me to be truthful with you. I am not afraid today. I have made up my mind.

   *    *    *    *    *    *

I have to live with myself and I cannot continue going around with something on my mind that I know isn't correct.

(N.T. First Trial 117).

At the second trial, Lorraine Custis testified with regard to her statements at the preliminary hearing as follows:

At the Magistrate's hearing . . . I had never been under anything like this before and it is an awful thing for any woman to go through, and I was absolutely afraid, not knowing just what would transpire. So when I, at the Magistrate's hearing, deep down in my heart I knew this was the man, but I was afraid to say so. And . . . I said that I had to come before the jury and tell the truth because I had to live with myself. And from the time of the Magistrate's hearing up until the last hearing this thing stayed in my mind because I knew I had not told the truth, and that is why at our last hearing I came and told the truth, so that I could live

with myself. It is impossible for you to live with yourself [sic] knowing that you did not tell the truth (N.T. Second Trial 68–69).

The issue for determination as stated by the Court of Appeals is whether the facts surrounding the out-of-court identification of Mackey Choice were so unnecessarily suggestive and conducive to irreparable mistaken identification that the subsequent in-court identification by the same witness denied Mackey Choice due process of law. In United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the Supreme Court in discussing the possible miscarriage of justice that could result from a mistaken identification, said:

A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to the witnesses for pretrial identification. A commentator has observed that "[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor—perhaps it is responsible for more such errors than all other factors combined." Wall, Eyewitness Identification in Criminal Cases 26. Suggestion can be created intentionally or unintentionally in many subtle ways. And the dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial, and thus his susceptibility to suggestion the greatest.

Moreover, "[i]t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before trial." Wade, supra, 388 U.S. at 228–229, 87 S.Ct. at 1933 (footnotes omitted).

In a companion case to *Wade*, the Supreme Court in Stovall v. Denno, *supra*, specifically disallowed, both prospectively and retroactively, the use of any identification testimony resulting from a procedure so unnecessarily suggestive and conducive to irreparable mistaken identification as to violate due process of law. The Court pointed out, however, that "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it," and held that a hospital room single suspect confrontation did not violate due process because an immediate identification was "imperative" due to the critical condition of the main prosecution witness. *Stovall, supra*, 388 U.S. at 302, 87 S.Ct. at 1972.

An analysis of the circumstances surrounding the identifications of Mackey Choice demonstrates that there was no imperative need for the suggestive identifications arranged by the police, and that the identification involved the very factors most strongly condemned as unduly prejudicial. Here, as in Foster v. California, 394 U.S. 440, 443, 89 S.Ct. 1127, 1129, 22 L.Ed.2d 402 (1969), "the suggestive elements in this identification procedure made it all but inevitable that [the witness] would identify petitioner whether or not he was in fact 'the man.' In effect, the police repeatedly said to the witness, '*This* is the man.' " (Emphasis in original).

■■ Assuming a pretrial identification procedure so impermissibly suggestive as to violate due process, the witness who has been subjected to such a procedure may not make an in-court identification unless the state establishes by "clear and convincing evidence" that the in-court identification has an origin independent of the illegal pretrial identification procedure. *Wade, supra*, 388 U.S. at 240, 87 S.Ct. 1926; United States ex rel. Thomas v. New Jersey, 472 F.2d 735 (3rd Cir. 1973). It is, of course, no answer to merely cite the apparent assuredness with which Mackey Choice was identified at the time of his trial. As our Third Circuit

Court of Appeals noted in United States v. Zeiler, (1st case), 427 F.2d 1305, 1308 (1970) ;

> The district court seems to have given decisive weight to the unequivocal way in which the witnesses identified Zeiler in the courtroom. However, their positiveness is irrelevant to the issue whether, consciously or subconsciously, that very in-court confidence in identification had been built up by the prior suggestive confrontation.

■■ In considering the totality of circumstances surrounding the out-of-court identification of Mackey Choice by the two bank tellers, Lorraine Custis and Alexander Johnson, the first factor to be discussed is the manner in which the out-of-court identifications were conducted.

There were two out-of-court identifications—the photographic identification on the day of the robbery and the station-house confrontation. As previously noted, at the photo identification at the bank, Lorraine Custis and Alexander Johnson, the witness who provided the in-court identification, were permitted to view the photographs simultaneously, and the identifications were made after considerable discussion. In addition, even after the photograph of Mackey Choice was identified, both tellers expressed some doubt by requesting to see the man. As stated in United States v. Wade, *supra*, the subtle interplay of will, ego, and perceptual memory in this situation cannot now be assessed, but it can be said with certainty that the reliability of such joint identifications has been repeatedly discredited as "fraught with dangers of suggestion." *Wade, supra* 388 U.S. at 234, 87 S.Ct. 1926; Gilbert v. California, 388 U.S. 263, 269–270, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). See also Montiero v. Pickard, 443 F.2d 311 (1st Cir. 1971) where a joint confrontation was held impermissibly suggestive; and United States v. Wilson, 140 U.S. App.D.C. 331, 435 F.2d 403 (1970), where the practice of joint identifications was strongly disapproved by the

District of Columbia Circuit. Compare United States v. Zeiler, 447 F.2d 993, 995 (3rd Cir. 1971) (Zeiler II), where the Third Circuit, in support of its finding that a photographic identification was not suggestive, noted that the witnesses were shown the pictures separately, and then interviewed separately as to their identification.

The station-house confrontation of Mackey Choice was also conducted jointly. Again it was Lorraine Custis, the teller with a minimal opportunity to observe the robber, who led the way in identifying Mackey Choice.

Although a one-on-one confrontation standing alone does not automatically void an identification under *Stovall*, "the presentation of only one suspect, in the custody of the police, raises problems of suggestibility that brings us to the threshold of an issue of fairness", Wise v. United States, 127 U.S.App.D.C. 279, 383 F.2d 206, 209 (1968), cert. denied, 390 U.S. 964, 88 S.Ct. 1069, 19 L.Ed.2d 1164 (1968). Indeed, the Court in *Stovall*, while approving a one-on-one confrontation where the witness was in danger of dying before a line-up could be arranged, noted that "the practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall, supra*, 388 U.S. at 302, 87 S.Ct. at 1972. Similarly, in *Wade, supra*, the Court catalogued instances of impermissibly suggestive identification procedures, and included that in which "the witness is told by the police that they have caught the culprit after which the defendant is brought before the witness alone or is viewed in jail . . . " Id. 388 U.S. at 233, 87 S. Ct. at 1935.

Indeed, the obvious example of this practice is that challenged in *Stovall* itself, a procedure which was ultimately upheld only because of the necessity demonstrated by the prosecution. There was certainly no such necessity present in the instant case, where the confrontation occurred two weeks after the robbery, and *Wade's* condemnation of the *Stovall* confrontation is all the more compelling:

> [T]he vice of suggestion created by the identification in Stovall, supra, was the presentation to the witness of the suspect alone handcuffed to police officers. It is hard to imagine a situation more clearly conveying the suggestion to the witness that the one presented is believed guilty by the police. *Wade, supra*, 388 U.S. at 234, 87 S.Ct. at 1936.[7]

In the wake of *Stovall*, the type of confrontation arranged by the police in the instant case has been condemned on repeated occasions. *See, e. g.*, United States ex rel. Rivera v. McKendrick, 448 F.2d 30 (2nd Cir. 1971) (single suspect showup, twelve days after robbery [and two years before *Stovall*] held unwarranted and impermissibly suggestive); Clemons v. United States, 133 U.S.App. D.C. 27, 408 F.2d 1230 (1968); Wright v. United States, 131 U.S.App.D.C. 279, 404 F.2d 1256 (1968); Gregory v. United States, 133 U.S.App.D.C. 317, 410 F. 2d 1016 (1969); Frazier v. United States, 136 U.S.App.D.C. 180, 419 F.2d 1161 (1969); LeBarron v. Burke, 314 F. Supp. 657 (W.D.Wis.1970); Rudd v. Florida, 343 F.Supp. 212 at 221–222 (M.D.Fla.1972); Roper v. Beto, 318 F. Supp. 662 (E.D.Tex.1970) (voice identification); United States ex rel. Geralds v. Deegan, 292 F.Supp. 968 (S.D.N.Y.

---

**7.** Compare Justice Douglas' treatment of single suspect confrontations in his dissent from the judgment of an equally divided court in Biggers v. Tennessee, 390 U.S. 404, 407, 88 S.Ct. 979, 981, 19 L.Ed.2d 1267 (1968):

"Whatever may be said of lineups, showing a suspect singly to a victim is pregnant with prejudice. The message is clear; the police suspect *this* man. That carries a powerfully suggestive thought. Even in a lineup the ability to identify the criminal is severely limited by normal human fallabilities of memory and perception. When the subject is shown singly, havoc is more likely to be played with the best-intended recollections." (Emphasis in original.)

1968). Single suspect confrontations have been approved only in the presence of a strong countervailing state interest, such as the fact that the witness was in extremis, *Stovall, supra,* or where prompt on-the-scene identifications not only will expedite the release of innocent suspects, but any suggestiveness is to a large extent neutralized by a freshness of perceptual memory. Russell v. United States, 133 U.S.App.D.C. 77, 408 F.2d 1280 (1969), cert. denied, 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245. United States v. Wilson, 140 U.S.App.D.C. 331, 435 F.2d 403 (1970); United States v. Washington, 144 U.S.App.D.C. 338, 447 F.2d 308 (1970).

The Supreme Court recently had the occasion to decide the reliability of a one-on-one station-house confrontation in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) and concluded that the show up was suggestive, but found that the identification was reliable based on the witnesses unusual opportunity to observe the assailant due to the nature of the crime (rape), the lack of any previous misidentifications by the witness, and the thorough description that was previously furnished to the police.

The second factor to be considered in determining whether the in-court identification of Mackey Choice violated due process is the opportunity the witnesses had to observe the criminal acts. As previously stated, Lorraine Custis' observations of the man she later identified as Mackey Choice were fleeting glimpses of a swiftly moving individual made under the barrel of a gun with orders to look straight ahead. Alexander Johnson's opportunity to observe the man he later identified as Mackey Choice was apparently limited to little more than a minute: the thirty or forty seconds where the robber was jumping over a gate four to five or eight to ten feet away, the brief face to face encounter where he was ordered into the vault and the few seconds where they faced each other in the vault. The evidence of the opportunity to observe of both tellers compares unfavorably with the numerous reported cases in which the opportunity to observe is cited as contributing substantially to the reliability of subsequent identifications. *See, e. g.,* United States v. Carney, 455 F.2d 925, 926 (3rd Cir. 1972) (observation for fifteen minutes while face to face); United States v. Lee, 148 U.S.App.D.C. 341, 459 F.2d 1365, 1367 (1972) (face to face observation for ten minutes in well-lighted store); United States v. Zeiler, 447 F.2d 993, 996 (3d Cir. 1971) (opportunity to observe robber in a well-lighted room for periods ranging from two to seven minutes at close distance). The decision of the Third Circuit in United States v. Higgins, 3 Cir., 458 F.2d 461 (1972), where a limited opportunity to observe was mentioned by the Court in its finding of an independent source for an in-court identification, does not appear controlling in view of the factual circumstances which surround these identifications. In *Higgins,* the Court found that the challenged lineup identifications were not unduly suggestive, because they occurred after an untainted photo identification.

The third factor to be considered in the totality of the circumstances is the existence of any discrepancies between Mackey Choice's description and any description given by the witness before the identification. The absence of any discrepancy in this case is of little weight because of the generality of the descriptions given by the witnesses.

The fourth factor to be considered in the totality of the circumstances is whether there was a previous identification by the witness of some other person. Alexander Johnson admitted at the hearing held by this Court that he identified the photos of two other persons as possible suspects at the photo identification staged on the day of the robbery.

The fifth and sixth factors to be considered in the totality of the circumstances are whether there were previous identifications or non-identifications of Mackey Choice. There were no identifications of Mackey Choice prior to the

tainted ones by Lorraine Custis and Alexander Johnson. The failure of Lorraine Custis and Alexander Johnson to identify Mackey Choice at the preliminary hearing was explained by them at the trial as having resulted from their fear of Mackey Choice.

The final factor to be considered in the totality of the circumstances is the lapse of time between the commission of the crime and the out-of-court identifications. The suggestive photo identifications were held on the same day as the robbery. This fact can hardly lend weight to the reliability of the in-court identification, in view of the uncertainty expressed by the tellers' request to see the man in person.

Mackey Choice has been incarcerated since his arrest on October 4, 1965. There was no evidence except the identification testimony of Tellers Custis and Johnson presented at either trial connecting Mackey Choice with this bank robbery, nor was any evidence suppressed before trial. Both trials in the State court were prior to *Stovall* and there was, therefore, no hearing at which Mackey Choice could challenge the admissibility of the in-court identification and it was left to the jury to pass on the credibility of the in-court identity witnesses.

In view of the suggestiveness of the two out-of-court identifications—the photo identification on the day of the robbery and the one-on-one station-house confrontation, the limited opportunity of the tellers to observe the robber, the selection of the photos of two other possible suspects on the day of the robbery, the absence of a previous untainted identification of Mackey Choice, and the fact that there was ample opportunity to conduct a lineup, together with the other circumstances heretofore discussed, this court concludes that the facts surrounding the out-of-court identification of Mackey Choice were so unnecessarily suggestive and conducive to irreparable mistaken identification that the subsequent in-court identification by these same two witnesses denied Mackey Choice due process of law.[8] The Commonwealth failed to show by clear and convincing evidence that the in-court identifications had an origin independent of the suggestive identifications. This Memorandum and Order shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure.

---

8. It would appear from the decision in Neil v. Biggers, *supra*, which the Supreme Court decided on December 6, 1972, several months after the Circuit Court remanded the instant case, that the testimony of the circumstances of the tainted out-of-court identifications in the Commonwealth's case in chief should not have been allowed to go to the jury.