Vontez KING, Appellant,

v.

COMMONWEALTH OF KENTUCKY,
Appellee.

No. 2002–SC–0730–DG.

Supreme Court of Kentucky.

May 20, 2004.

Rehearing Denied Sept. 23, 2004.

Bryce Hale Amburgey, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Todd D. Ferguson, Assistant Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice WINTERSHEIMER.

This appeal is from an opinion of the Court of Appeals affirming a judgment based on jury verdict that convicted King of three counts of fraudulent use of a credit card over $100.00 and one count of being a first-degree persistent felony offender. He was sentenced to a total of fifteen years in prison.

The questions presented by King focus on the decision of the trial judge to admit into evidence both the in-court and out-of-court identifications made by two witnesses and an in-court identification made by a third witness. He also contends that simultaneous viewing by two witnesses was crucial to the suggestiveness and the eventual tainting of their out-of-court identifications and subsequent in-court identifications.

The victim was contacted by her credit card company about certain purchases on December 5, 2000, at a Barbourville Wal–

Mart. She called the Wal–Mart to report the unauthorized activity and the store, in turn, called the police.

An in-store surveillance camera recorded two of the transactions. The investigating police officer testified at trial that when he watched one of those tapes at the store that same day, he immediately recognized King, an individual he had known for two or three years. After he left the store to return to the police station, the officer saw King walking on a sidewalk. King was wearing the same clothes as observed by the police officer in the tape.

Also testifying at trial were the three Wal–Mart cashiers who each handled one of the fraudulent transactions made by King. For the purposes of this opinion, we will identify them as cashier # 1, cashier # 2 and cashier # 3. Cashier # 1 testified about the transaction with King and made an in-court identification of him. Cashiers # 2 and # 3 testified about their transactions with King and their out-of court identifications. They also identified King in-court.

The jury convicted King of three counts of fraudulent use of a credit card over $100.00 and for being a first-degree persistent felony offender. The prior felony offenses included the following: first-degree wanton endangerment; possession of a handgun by a convicted felon; theft by unlawful taking over $300; two counts of third-degree burglary; second-degree robbery; nine counts of second-degree complicity to criminal possession of a forged instrument; complicity to criminal possession of a forged instrument; three counts of second-degree forgery; theft by unlawful taking; second-degree robbery; third-degree robbery; and theft by unlawful taking.

In the present case, King was sentenced to five years on each charge, enhanced to fifteen years because of the persistent felo-ny charge. The trial judge ultimately ordered the sentences to run concurrently for a total of fifteen years in prison. The Court of Appeals affirmed the judgment of conviction and this Court granted discretionary review.

Because the arguments by King are closely related, we will consider them together. King asserts that cashiers # 2 & # 3 were improperly allowed to give unreliable testimony regarding in-court and out-of-court identifications based on an impermissibly suggestive photographic line-up. He also contends that cashier # 1 was improperly allowed to identify him in-court when that identification was tainted and rendered unreliable by an impermissibly suggestive "show up" procedure. We disagree.

Before trial, counsel for King filed a motion to suppress the photo array identifications and any future in-court identifications that may be made by the witnesses who viewed the photo array. The trial judge held a hearing on the motion and the investigating police officer as well as the three Wal–Mart cashiers testified. The following is a brief summary of the testimony of the four witnesses at the suppression hearing.

**Testimony of Barbourville Police Officer**

The Barbourville city police officer testified that he went to the Wal–Mart store after being contacted by its loss prevention officer and while there he was shown an in-store video surveillance tape of a transaction taking place. The officer immediately recognized King in the video tape as someone he knew. When the officer left the store to return to the police department, he observed King walking on the sidewalk. King was wearing the same clothes he had on in the videotape. The

officer took King to the police station at that time.

According to the officer, cashier # 1 came to the station later that night and she identified King by what he was wearing. Cashier # 1 was taken into a room with King and according to the officer, King immediately objected stating, "You can not do that because I am the only black man here. She is going to know it's me." The officer told cashier # 1 to leave the room and two or three minutes later she identified King.

At some point in his investigation, the officer assembled a photo array of six African–American males. The pictures were taken from a database of arrests and according to the officer, they were the best pictures he could come up with. Only cashiers # 2 and # 3 were shown this photo array.

### Testimony of Cashier # 1

Cashier # 1 testified that King came into the store to purchase a stereo. She removed the item from the display case and took it to her register. King gave her two different credit cards and both were rejected. He left and twenty minutes later he returned to purchase the stereo with a third credit card. This time the transaction required cashier # 1 to "compare signatures" and she asked King for identification. He stated that it would not match because he was using his married daughter's credit card. King signed the receipt "Mike King." The cashier completed the transaction.

That night, cashier # 1 was asked to come to the police station. According to her testimony, she was shown a camera with King's picture on it. (Obviously, this was a digital camera with King's picture displayed in the view screen). At first, the cashier stated she was not sure, but then said that it looked like him. The officer then took her into a room with King. When

King jumped up, she noticed that it was him and then she left the room. After departing the station and returning home, cashier # 1 prepared a written statement that was given to police.

### Testimony of Cashier # 2

Cashier # 2 testified that King brought a DVD player to her counter and gave her a credit card. When she asked him whose it was, he said it was his mother's. King signed the receipt "Al Wilson." The cashier completed the transaction and King left.

Cashier # 2 went to the police station on December 8, 2000. Before going, she prepared a written statement at home that described King as a black male, 5'7", 180 pounds, with eyeglasses, a mustache and a blue and white coat. At the police station, cashier # 2 identified King from a photo array. She also stated that cashier # 3 viewed the photo array at the same time; she was standing and cashier # 3 was sitting down.

### Testimony of Cashier # 3

Cashier # 3 testified that King came to her register with several large items and that she specifically remembered him having a talking Winnie the Pooh. King used a credit card to pay for the purchase. The cashier did not remember whose name was on the card, but King signed the name "Al Wilson."

Cashier # 3 prepared a written statement at work before going to the police station on December 8, 2000. She described King in her statement as a black male. At the station, she was shown a photo array at the same time as cashier # 2. Cashier # 3 identified King; she was very sure about his identification.

Following the testimony at the hearing, defense counsel made an additional objection to the identification process, claiming

added prejudice because cashiers # 2 and # 3 were in the same room together. She also objected to the identification by # 1 because she was shown the single picture of King and was brought into a room with him.

As to cashiers # 2 and # 3, the trial judge overruled the motion to suppress. He found that the photo lineup presented was constitutionally sufficient. The trial judge noted that the background of the photos were not the same, but were similar. He found that there was no identifying information on the array, although there was a height chart. The trial judge acknowledged that a perfect photo-pack may have included another person with eyeglasses or greater variations in ages, but that a perfect photo-pack is not required, only one that is not unduly suggestive.

As to cashier # 1, the trial judge sustained the motion to suppress her out-of-court identification because she was shown a single photograph of King and then was taken into a room with him. Her written statement was also suppressed because it came after she left the police station. The trial judge added that cashier # 1 would, however, be allowed to testify from her independent recollection about the transaction.

The "clearly erroneous" standard applies to a trial judge's findings of fact on a motion to suppress evidence. *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972). A trial judge's ruling as to the admissibility of evidence is reviewed under an abuse of discretion standard. *Cf. Goodyear Tire & Rubber Co. v. Thompson,* Ky., 11 S.W.3d 575 (2000). An abuse of discretion occurs when a "trial judge's decision is arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* at 581 *citing*

*Commonwealth v. English,* Ky., 993 S.W.2d 941 (1999).

The determination of whether identification testimony violates a defendant's due process rights involves a two-step process. *Dillingham v. Commonwealth,* Ky., 995 S.W.2d 377, 383 (1999) *quoting Thigpen v. Cory,* 804 F.2d 893, 895 (6th Cir. 1986), *cert. denied sub nom. Foltz v. Thigpen,* 482 U.S. 918, 107 S.Ct. 3196, 96 L.Ed.2d 683 (1987); and *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). "First, the court examines the pre-identification encounters to determine whether they were unduly suggestive." *Id.* If not, the analysis ends and the identification testimony is allowed. "If so, 'the identification may still be admissible if under the totality of the circumstances the identification was reliable even though the [identification] procedure was suggestive.'" *Id. quoting Stewart v. Duckworth,* 93 F.3d 262, 265 (7th Cir.1996) and *Neil, supra.*

Determining whether under the totality of the circumstances the identification was reliable requires consideration of five factors enumerated by the United States Supreme Court in *Neil.* The five factors are: 1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of his prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and confrontation. This Court has previously adopted these factors in *Savage v. Commonwealth,* Ky., 920 S.W.2d 512 (1995).

As to cashier # 1, we find that the trial judge did not abuse his discretion in determining that the pre-trial identification procedure used was impermissibly suggestive and that all evidence of that pre-trial identification was inadmissible. We also find no abuse of discretion with

his decision to allow cashier # 1 to identify King at trial from her independent recollection of the event.

Because the trial judge determined that the pre-trial identification procedure used was impermissibly suggestive, it is necessary to apply the five-factor test of *Neil, supra.* We must observe that the trial judge made no finding of facts on this issue nor was he asked to. However, the record fully supports the ultimate decision by the trial judge.

As to the first two factors of *Neil,* cashier # 1 had an adequate opportunity to view the suspect. Twice, King attempted to make a purchase with a credit card. After both attempts were denied, he left and returned twenty minutes later with a third card. This time he presented a card belonging to another and the transaction required him to show identification. King told the cashier that the card belonged to his married daughter and the cashier processed the transaction. Not only did these series of interactions between cashier # 1 and King provide an opportunity for her to view him, but the denial of the credit card enhanced the level of attention that she paid to him.

Applying the third factor, we note that cashier # 1 did provide a very detailed description of King in a written statement. That statement, however, was not made until after she left the police station and returned home. Thus, this was not a factor weighing in favor of admission. We must observe that none of the actual written statements made by the cashiers were introduced at trial, but that all three were partially read into the record.

As to the fourth factor, cashier # 1 was shown a digital photo of King, and at first said she was uncertain if it was him, but then stated that it looked like him. Next, she had a brief in-person viewing of King, whereupon she "noticed that it was him."

Applying the fifth factor, the identification by cashier # 1 occurred the very night of the alleged transactions while her interactions with King were still fresh in her mind. Upon consideration of all five factors, we conclude that the trial judge properly allowed cashier # 1 to identify King at trial.

■ With respect to cashiers # 2 and # 3, the trial judge allowed evidence of both the pretrial identifications and the at-trial identifications because the photo array shown to them was not unduly suggestive. King argues to the contrary, alleging that he was singled out in the lineup because he was older than the other men, because he was shorter than four of the men, and because he was the only man wearing eyeglasses and a jacket.

Upon extensive review of the photo array, we can find no error by the trial judge in his decision that it was not unduly suggestive. All six photos are of African–American males, all are pictured in substantially similar surroundings and it is clear that all were in custody at the time the photographs were taken. Although each subject was standing in front of a height chart, only on three pictures, including King's, is the exact height apparent. It is somewhat difficult to tell from the neck-up photographs that King was wearing a jacket and it is impossible to determine from the black and white photographs whether that item of clothing was blue. The ages of the men were not clearly discernible and although the Court of Appeals found it troubling that only King wore glasses, this fact did not rise to the level of a due process violation. To the extent that it was necessary for the trial judge to find a fact that the identification was not unduly suggestive, we determine that he was not clearly erroneous in his conclusion.

■ Finally, we must address the issue raised by King that the simultaneous viewing by cashiers # 2 and # 3 was suggestive and eventually tainted the out-of-court identification procedures and the subsequent in-court identifications. He suggests a per se exclusionary rule whenever there is a simultaneous identification of a suspect by more than one witness in the presence of each other.

Where witnesses are together when they make an identification, there is a danger that the identification by the first could influence the others in making their decisions. Although simultaneous viewing might be better avoided, we do not find there is any need to adopt a per se rule as suggested by King.

Here, the evidence at the suppression hearing was that cashiers # 2 and # 3 viewed the photo array simultaneously. According to cashier # 2, cashier # 3 was sitting down and she (# 2) was standing. As previously noted, the police officer stated that both cashiers identified King without hesitation. Further, both cashiers stated that they identified King and # 3 also asserted she was sure it was him. Importantly, there was no evidence at the suppression hearing concerning who picked King out first. That information was only revealed during the presentation of evidence to the jury. No further objection was made at that time. After careful review of the record, we conclude that the trial judge did not abuse his discretion in denying the motion to suppress the identifications made by cashiers # 2 and # 3.

■ Any possible error in allowing the pretrial or in-court identification of King must be considered harmless when measured against the totality of the evidence presented in this case. The police officer testified that in viewing the store surveillance tape, he was able to immediately identify King. He stated that he had known the accused for two or three years prior to these charges. The police officer further testified that King was arrested on the day of the incidents wearing the same clothing that can be seen on the surveillance tape. All three of the cashiers were able to identify the hat and the jacket at trial. All three were able to identify King from the two-picture photo lineup prepared by defense counsel.

In addition, the husband of cashier # 1 was with her at the Wal–Mart at the time of the incident. The husband recalled the transaction and was able to describe King and identify his coat and hat at trial. Therefore, based on the totality of the circumstances, we must conclude that there is no fundamental error and that the accused received a fair trial and was not denied due process of law in any respect.

The opinion of the Court of Appeals is affirmed.

LAMBERT, C.J., and GRAVES, J., concur.

JOHNSTONE, J., concurs by separate opinion.

STUMBO, J., dissents by separate opinion and is joined by COOPER and KELLER, JJ.

Concurring opinion by Justice JOHNSTONE.

Because I agree with Justice Stumbo's analysis of the identification issues in this case, but disagree with her conclusions based on that analysis, I concur in the majority opinion in result only.

I agree completely with Justice Stumbo that the trial court should have suppressed Ross's in-court identification of King. But I disagree with her conclusion that the error was not harmless beyond a reasonable doubt. Ross was neither the only person,

nor the only cashier to identify King. Cashier Carnes identified King, and both the dissent and the majority's opinion agree that there was no error in her in-court identification. Further, the police officer investigating the case, who was familiar with King, positively identified King from the video tape of the transactions in question. And, finally, all three cashiers identified King's hat and coat, which he was wearing on the video tape.

Dissenting opinion by Justice STUMBO.

Respectfully, I dissent from the majority opinion because I believe Appellant should be entitled to a new trial due to the trial court's failure to exclude the out-of-court and in-court identification of Appellant made by witness Karen Ross (cashier #3).

First, I believe that the photo array shown to witnesses Ross and Devonda Carnes (cashier #2) was unduly suggestive. Most all descriptions of the suspect indicated that he was a black man in his mid to late thirties, approximately six feet tall, wearing eyeglasses and a blue and white jacket. Ross's prior written description of the suspect merely indicated that he was a black male. The photo array showed to the witnesses depicted five black men ages 18, 20, 20, 21, and 24, and Appellant who was 37 years old at the time. Also, only two of the men were less than six feet tall—Appellant who was 5'10" and the 18-year-old man who was 5'8". Most importantly, Appellant was the only one in the array who was wearing eyeglasses and a jacket.

[A] photograph identification procedure is impermissibly suggestive only when elements in the photographs other than minor variations in the physical features of the individuals pictured mislead witnesses in making their identifications, *e.g.* where the witness describes a criminal as wearing a hat, and the defendant is the only one wearing a hat, or where dates are written on the photographs, and the defendant's photograph is the only one with a date close to the time when the crime of which he is accused occurred.

*Adkins v. Commonwealth,* Ky.App., 647 S.W.2d 502, 504–505 (1982). Further illustration of the undue suggestiveness of the identification procedure is evidenced by the fact that Ross was only able to identify Appellant after Carnes first identified Appellant in Ross's presence.

Although in my opinion the photo array was unduly suggestive, the in-court identifications could still be admissible if each was found to be reliable. *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). I agree with the majority that Carnes's identification was probably reliable because initially she gave a fairly detailed and ultimately accurate description of the suspect. Ross's statement that was written before viewing the photo array, however, only described the suspect as a black man. At trial, Ross testified that she remembered the suspect to be of medium height, with a blue and white windbreaker, dark hat, glasses, and a moustache. But when questioned by the Commonwealth about why she did not include these facts in her initial description, Ross stated, "what I remembered most was the fact that he was a black man, the other details as far as the hat ... I didn't ...." She also stated that she specifically remembered the particular items purchased by Appellant and that his hands were black (suggesting her gaze was fixed downward during the transaction). It is also important to note that Ross was not aware a crime was occurring while processing Appellant's transaction, and was not made aware of that fact until the next day; therefore, there would be no reason for the particular transaction to stand out

to a cashier who had presumably waited on numerous people that day during the Christmas season at Wal–Mart (Ross testified that she waited on Appellant around 5:45 p.m. and that her shift ended at 6:00 p.m.). It was then another two days before Ross was taken to the police station to view the photo array.

Each of the facts above weigh heavily in favor of the likelihood that Ross misidentified her last customer on the day in question. To further compound the error, Ross watched as her co-worker, Carnes, identified Appellant from the photo array. "An identification procedure by two or more witnesses in the presence of each other is 'fraught with dangers of suggestion.'" *Rudd v. Florida,* 343 F.Supp. 212, 220 (M.D.Fla.1972) (quoting *United States v. Wade,* 388 U.S. 218, 234, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)). The Sixth Circuit denounced this very procedure in *United States v. Bridgefourth,* 538 F.2d 1251 (6th Cir.1976). There, the court stated, "[w]e do specifically disapprove of any consultation of witnesses engaged in inspecting displays of photographs during police attempts to identify an offender." *Id.* at 1253. Other courts have held the simultaneous identification by witnesses to be impermissibly suggestive. *See Monteiro v. Picard,* 443 F.2d 311 (1st Cir.1971) (holding in-court identifications by witnesses were tainted due to simultaneous viewing and consultation with another witness who had strong personality and who had identified suspect first); *United States v. Wilson,* 435 F.2d 403 (D.C.Cir.1970) (discussing the impropriety of joint identifications by two or more witnesses); *United States ex rel. Choice v. Brierley,* 363 F.Supp. 178, 188 (E.D.Pa.1973) (finding joint viewing unduly suggestive and stating that "the reliability of such joint identifications has been repeatedly discredited as 'fraught with dangers of suggestion'"); *State v. Morris,* 97 Idaho 420, 546 P.2d 375, 378 (1976) (stating that law enforcement should avoid having witnesses make identifications from photo array in the presence of one another, as "[t]he faulty procedure may well render evidence of the photographic lineup inadmissible"); *People v. Leite,* 52 A.D.2d 895, 383 N.Y.S.2d 71 (N.Y.App.Div.1976) (suppressing photographic identification and stating, "[i]n our opinion, having the three victims examine the mug shots together was fraught with danger. The possibility, and even the likelihood, that an identification by one of the viewers would influence or cause an identification by the others was patent").

Here, Ross had the benefit of first observing Carnes identify Appellant from the photo pack. This identification procedure was so impermissibly suggestive that it may well have given rise to a "substantial likelihood of irreparable misidentification" by Ross. *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Therefore, it is my opinion that the trial judge's decision to allow the out-of-court and in-court identification by Ross was clearly erroneous. *See Biggers, supra.* I also cannot agree that the inclusion of Ross's testimony was harmless error. Clearly, there was not overwhelming proof of guilt in this case. Appellant was apprehended on the street shortly after the alleged theft and was not found with the stolen credit card or any of the purchases. Therefore, I am not prepared to say that the constitutional error committed in this case was harmless error beyond a reasonable doubt. *See Wilson v. Commonwealth,* Ky., 695 S.W.2d 854 (1985).

COOPER and KELLER, JJ., join this dissent.